OPINION OF THE COURT
Jeffry H. Gallet, J.
This extension of placement proceeding under Family Court Act § 1055 raises questions as to the perimeters of the Family Court’s jurisdiction.
HISTORY OF THE CASE
Melissa Riddle was born on June 19, 1982. Less than two months later, she was remanded to the Commissioner of Social Services who has had responsibility for her since that time. On *836 November 22, 1982, after a finding of neglect, Melissa was placed with the Commissioner for 18 months. On December 8, 1982, the Commissioner placed the child with St. Christopher’s Home for Children, an authorized agency, which in turn placed her with Peter W. and Judy W. (the Foster Parents), where she continues to reside.
On March 1,1984, the Commissioner filed a petition to extend placement for one year pursuant to Family Court Act § 1055. The Commissioner’s long-term plan, with the agreement of St. Christopher’s, was for eventual discharge of the child to her mother. On May 1, Melissa’s mother appeared in the intake part, was assigned counsel and indicated her intent to oppose the extension. On May 15, she requested a long adjournment, because, as her lawyer indicated, the mother “is progressing very nicely. We would just like her to continue for a longer period of time.”
The court adjourned the proceeding to the end of June and confirmed the mother’s right to visitation. As a result of a clerical error, the case did not come to trial until November 15.
On May 24, the situation changed. St. Christopher’s permitted an overnight visitation between Melissa and her mother. During that visit, the mother suffered a major emotional disturbance which resulted in her being removed in a straightjacket to Nassau County Medical Center, where she was diagnosed as being suicidal and having overdosed on drugs. During the incident, her mother left Melissa with her great-aunt and uncle, Jose and Claire H. (the Extended Family).
Social workers at St. Christopher’s, having met the Extended Family for the first time, quickly moved to develop them as a resource. While St. Christopher’s social workers developed a positive relationship between Melissa and the Extended Family, including the H.’s young children, they decided that the mother was no longer a resource for Melissa and would not be one for the foreseeable future.
At that point the St. Christopher’s social workers faced a decision. With the father having been previously eliminated as a resource by them and the mother, in their opinion, no longer a viable resource, they had to choose between the Foster Parents and the Extended Family for a permanent home for Melissa. The choice was a difficult one, not because of the usual problem of a lack of adequate resources, but because both homes provided better than adequate resources.
The Foster Parents had opened their hearts and their home to Melissa, as they had to several prior foster children. Melissa has *837 lived with them virtually all of her life and has received what St. Christopher’s characterized as “exceptional” care. To a great extent, the Foster Parents are Melissa’s psychological parents and they wish to adopt her.
The Extended Family also offers a good and loving home. In addition, they also offer easy access to Melissa’s natural relatives and to her mother.
St. Christopher’s added another factor to the equation, an unwritten Department of Social Services policy to favor a natural family in such choices, a policy St. Christopher’s contends is supported by standard social work procedures.
On October 16, St. Christopher’s filed a motion to terminate the placement and to discharge Melissa to the Extended Family. The next day the Foster Parents moved the court to order a proceeding to terminate the parental rights of Melissa’s parents and free her for adoption by them. (Family Ct Act § 1055 [d].)
By the time the case came on for trial on November 15, all of the parties conceded that neither of Melissa’s parents was able to care for her at that time and that placement should be extended. The remaining issue was the terms of the extension. The Commissioner and St. Christopher’s favored a short extension with a trial discharge to the Extended Family. The Foster Parents and the Law Guardian argued for a residential status quo and an order to commence a termination proceeding. (Family Ct Act § 1055 [d].) Melissa’s mother proposed a goal of discharge to her after expiration of the new placement (Family Ct Act § 1055 [c]) and if that did not occur, discharge to the Extended Family. Melissa’s father defaulted and did not appear. St. Christopher’s introduced his signed consent to a discharge of Melissa to the Extended Family. There was no evidence as to the circumstances surrounding the execution of that consent.
EXTENSION OF PLACEMENT FAMILY COURT JURISDICTION
The Family Court is a court of limited jurisdiction. (NY Const, art VI, § 13 [c]; Matter of Mouscardy v Mouscardy, 63 AD2d 973 [2d Dept 1978].) It possesses only that jurisdiction specifically granted to it by the Constitution and the Legislature. Among its areas of jurisdiction is exclusive original jurisdiction over child neglect proceedings. (Family Ct Act § 115 [a] [i].) As part of that jurisdiction, it has the power, after a finding of neglect, to place a child in the custody of the Commissioner of Social Services, as was done here. (Family Ct Act § 1052 [a] [iii]; § 1055 [a].) That placement may be extended for successive periods of one year, *838 after a hearing and a finding of a need to extend placement and that placement is in the best interests of the child. (Family Ct Act § 1055 [b] [i], [ii]; Matter of Nassar v Santmire, 99 AD2d 377 [4th Dept 1984]; Matter of Sunshine A. Y., 88 AD2d 662 [2d Dept 1982] .) An order extending placement may provide that the Commissioner undertake diligent efforts to improve the parent-child relationship or that he commence a proceeding to terminate parental rights. (Family Ct Act § 1055 [c], [d].) However, Family Court Act § 1055, unlike Social Services Law § 392, makes no provision for the court to review the conditions of the Commissioner’s placement plan.
Traditionally, the Commissioner has taken the position that the court can do no more than make or extend the placement, with the responsibility for the child’s well-being exclusively left to him. (Matter of Damon A., 61 NY2d 77 [1983].) He notes that the Legislature has not granted the court the power to review his plans for a child placed under Family Court Act § 1055 that it has granted under Social Services Law § 392 for certain other placements. That demonstration of legislative intent is, indeed, significant.
The Court of Appeals has held that the Family Court, even with the best of intentions, cannot intrude into the Commissioner’s area of responsibility. (Matter of Lorie C., 49 NY2d 161, 170 [1980].) It noted, quoting the United States Supreme Court in Bell v Wolfish (441 US 520,562), which dealt with other circumstances, that “ ‘[U]nder the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan.’ ” (See also, Matter of James B., 96 AD2d 730 [4th Dept 1983]; Matter of William LL., 84 AD2d 877 [3d Dept 1981].)
That is not to say that the court is expected to simply send children into placement without further investigation. There is substantial legislative intent to the contrary. The Legislature’s findings, as set forth in Family Court Act § 141, are that once the court intervenes in the life of a child, it has a wide range of powers and wide discretion to exercise those powers. Family Court Act § 1011 charges the court with the protection of the physical, mental and emotional well-being of children brought before it in child protective proceedings. In Social Services Law § 384-b (1), which is applicable to children placed pursuant to Family Court Act § 1055, the Legislature has expressed its intent that such children have permanency and stability in their lives.
*839 With that mandate, the court can, indeed must, satisfy itself that the Commissioner’s plan is adequate for the child with a satisfactory permanency goal. That is not to say that the court may substitute its judgment for the Commissioner’s and choose between adequate plans or design its own plan in place of an adequate plan proposed by the Commissioner. That is not the court’s function, but it can satisfy itself that the Commissioner’s plan meets the child’s needs.
It must be noted that a child such as Melissa may well find herself the subject of five or more separate proceedings in three different courts before she finds permanency. One Family Court Judge hears the child protective proceeding and makes the first placement. (Family Ct Act § 1051 [a]; § 1055 [a].) Other Family Court Judges may hear successive annual extensions of the placement. (Family Ct Act § 1055 [b].) Yet another Family Court Judge or a Surrogate may hear a termination of parental rights proceeding (Social Services Law § 384-b) and another Family Court Judge or Surrogate an adoption proceeding. (Domestic Relations Law art 7.) Furthermore, any person aggrieved by a removal of a child from a foster home or institution may seek review of the removal in the Supreme Court. (Social Services Law §§ 22, 400; CPLR 7801, 7804 [b], [g].) Each of these Judges has authority to affect the child’s well-being, but only within the perimeters of the proceeding before him or her.
It is against that framework that the various applications must be considered.
EXTENSION OF PLACEMENT EFFECTIVE DATE
Melissa’s initial placement expired on May 22, 1984. The extension hearing was delayed, first at the mother’s request and later for a substantial amount of time as a result of a clerical error. There was then an extensive trial of 18 days. During the period of delay, the placement was temporarily extended 22 times, for good cause shown each time. (Family Ct Act § 1055 [b] [iv].)
The Commissioner argues that placement should be extended from the date of the expiration of the last temporary extension. The mother takes the position that the court can do no more than extend placement one year from the expiration of the original placement. Neither cites case law to support their position, and the court has found none on the subject. However, logic dictates that the extension should run from the date of this order rather than from the date of the expiration of the initial placement.
*840 The obvious purpose of the extension provisions of Family Court Act § 1055 is to guard against a child being placed and then forgotten. The statute requires that the Family Court make a finding for each extension that placement is in the child’s best interests and should be extended. There is nothing in the statute which limits the aggregate time the child may remain in placement. Rather, it contemplates “successive” extensions, without limit, until a child reaches her or his majority. (Family Ct Act § 1055 [b] [i].)
It should be noted that each of the temporary extensions required a judicial finding of good cause. (Family Ct Act § 1055 [b] [iv].) During the period of the temporary extensions, Melissa’s placement was closely monitored by the court.
The extension hearing, which is in the nature of a dispositional hearing (Family Ct Act §§ 1055, 1052), included evidence to the present time and the findings are based in part on recent events. (Matter of Nassar v Santmire, supra; Besharov, Supplementary Practice Commentaries, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 1055, 1984-1985 Pocket Part, p 34.) Accordingly, the extension should reflect the finding that a placement for one year from now is necessary and in Melissa’s best interests. To rule otherwise would require another extensive trial, on the same issues, only two months after the order in this case. Such a trial would frustrate the Legislature’s desire to afford foster children some measure of stability.
EXTENSION OF PLACEMENT TERMINATION OF PARENTAL RIGHTS
The mother declined to testify. Where a party declines to testify in a civil proceeding, the trier of the facts, in this case the court, may draw the strongest inferences against that party which the record permits. (Noce v Kaufman, 2 NY2d 347 [1957]; Matter of Commissioner of Social Servs. [Patricia A.] v Philip De G., 59 NY2d 137 [1983]; Matter of Randel, 158 NY 216 [1899].) While the failure to produce documentary evidence may give rise to a conclusive inference, the weight given to the failure to produce oral evidence rests here with the court. (Reehil v Fraas, 129 App Div 563 [2d Dept 1908]; Richardson, Evidence, at 65-68 [Prince 10th ed 1973]; Canudo, Evidence Laws of NY, at 14-18B [1985 rev].)
The proceeding sub judice is unusual. Family Court Act § 1055 (d) permits the court, upon finding “reasonable cause,” to order the commencement of a proceeding to terminate parental rights. Although that term is not further defined in the Family *841 Court Act or by case law, CPL 70.10 (2) has the following definition: “ ‘Reasonable cause to believe that a person has committed an offense’ exists when evidence or information which appears reliable discloses facts or circumstances which are collectively of such weight and persuasiveness as to convince a person of ordinary intelligence, judgment and experience that it is reasonably likely that such offense was committed and that such person committed it.” It would seem that the same standard is appropriate here.
Faced with such a low standard of proof, it offends justice to require a parent to present her defense at this stage, before the petitioner’s proof is required to reach the level of a prima facie case. Indeed, the transcript of the mother’s testimony could be used to establish a prima facie case against her if a termination proceeding is ordered. Such a procedure would fail to meet the due process standard envisioned by the United States Supreme Court in Santosky v Kramer (455 US 745 [1982]), which, among other things, requires a finding against the parents by clear and convincing evidence, a high standard of proof.
Social Services Law § 384-b (4) (d) and § 384-b (7) (a)-(f) provide for parental rights to be terminated if a parent fails to plan for the future of a child, although physically and financially able to do so.
The evidence presented, primarily through the testimony of two social workers from St. Christopher’s and St. Christopher’s case record, shows a history of failure to engage in psychotherapy, failure to hold a job, although each parent has marketable skills, and failure to maturely manage their money while they were employed. In addition, they changed residences frequently, often because of disagreements with their landlords. Both social workers opined that they believed neither parent was capable of planning for the child.
The question of whether to order a termination proceeding is particularly critical here because of Melissa’s tender age. If her parents’ rights are terminated, Melissa has two fine sets of prospective adoptive parents who can offer her stability and the opportunity to grow up normally. Therefore, it is essential that the termination issue be promptly disposed of one way or the other.
The record reflects reasonable cause to believe that grounds for a termination for failure to plan for the child exists as to both parents. In addition, the father’s infrequent interest in the child may also be the basis for the termination of his rights. The issue *842 should be settled by a full evidentiary hearing with the due process protections mandated by Santosky v Kramer (supra).
Merely discharging Melissa, at age three, to the Extended Family, as St. Christopher’s and the Commissioner propose, is not an adequate plan. It is clear from the case record that the mother will sue for custody at her first opportunity and, if she is unsuccessful, frequently thereafter. The Extended Family, if they elect to oppose the application, will be obligated to prove the existence of extraordinary circumstances, as that term is defined in Matter of Bennett v Jeffreys (40 NY2d 543), without access to the considerable resources of the Commissioner or St. Christopher’s.
EXTENSION OF PLACEMENT THE PLAN
The discharge plan is inconsistent with the direction to commence a termination proceeding and the Commissioner and St. Christopher’s may not proceed with that aspect of their plan.
The only remaining question is where Melissa will reside during the extended placement. Both the Foster Parents and the Extended Family claim special consideration as a result of their respective status.
The Extended Family, citing People ex rel. Sibley v Sheppard (54 NY2d 320 [1981]), make a “blood is thicker than water” argument. However, that argument has been rejected by the Court of Appeals. (Matter of Peter L., 59 NY2d 513 [1983].) That is not to say that whatever special advantages they may be able to offer Melissa as a result of being her natural family should not be considered. Certainly they should, but the mere fact of being the natural family gives the H.’s no special rights in this proceeding.
The Foster Parents’ claim to special standing is more troublesome. Foster Parents have no special rights to their foster children except as may be specifically given to them by statute, and then only if the statute protects the constitutional rights of the child and the natural parents. (Smith v Organization of Foster Families, 431 US 816 [1977]; Matter of Bennett v Jeffreys, supra.) Although they have substantial rights in other parts of the multiproceeding legal framework described above, their rights in extension proceedings are limited by Family Court Act § 1055 to procedural matters, unlike an adoption proceeding where they are given a special preference to adopt. (Social Services Law § 374 [1-a]; § 383 [3].)
*843 The Foster Parents further argue that the child has spent most of her life with them and that removing her at this point will cause her substantial emotional damage. In support of that position they offered the expert opinion of a psychiatrist, Dr. Jeffrey Sverd, who testified that in every case of a child Melissa’s age the removal of a child from his or her foster parents, even to be returned to his or her natural parents, will cause such damage. He did not testify that Melissa’s risk is measurably greater than the norm. The Extended Family countered with their own psychiatrist, Dr. John Price, who opined that Melissa would suffer some short-term emotional dysfunction, but had minimal risk of long-term damage.
The problem of the emotional effect of removing a child from a secure foster home has been of concern to both mental health professionals and the courts. (Matter of Spence-Chapin Adoption Serv. v Polk, 29 NY2d 196 [1971]; Green, Child Maltreatment — A Handbook for Mental Health and Child Care Professionals, at 229-230 [1980].) The Foster Parents urge that the child should remain with them because their care of the child has been so loving and extraordinarily good that removal of the child from their home would cause her distress and possible long-term damage. As seductive as that argument is, it has been rejected by the appellate courts. (Matter of Spence-Chapin Adoption Serv. v Polk, supra; People ex rel. Ninesling v Nassau County Dept. of Social Servs., 46 NY2d 382 [1978]; Smith v Organization of Foster Families, supra; see also, The Due Process Rights of Foster Parents, 50 Brooklyn L Rev 483-515.)
The teaching of the Court of Appeals in Matter of Spence-Chapin Adoption Serv. v Polk (supra, at p 205), is on point here: “To the ordinary fears in placing a child in foster care should not be added the concern that the better the foster care custodians the greater the risk that they will assert, out of love and affection grown too deep, an inchoate right to adopt. The temporary parent substitute must keep his proper distance at all costs to himself.”
Absent testimony that Melissa’s is an unusual case, there are no grounds for the court to substitute its judgment for the Commissioner’s but the Commissioner should consider the opinions of Drs. Sverd and Price in choosing the proper residence for Melissa, pending the verdict in the termination proceeding. That decision, however, remains with the Commissioner, subject to review pursuant to Social Services Law §§22 and 400.
DECISION
Melissa’s placement is extended until February 28,1986. The Commissioner and St. Christopher’s are ordered to commence a *844 termination of parental rights proceeding and they are prohibited from discharging Melissa during the extended placement period until either the conclusion of the termination proceeding or further order of this court. The Commissioner and his agents are charged with the responsibility of determining the appropriate residence for Melissa.