Marc TENENBAUM and Mary Tenenbaum, individually and on behalf of Sarah Tenenbaum, an infant, Plaintiffs,

v.

Nat WILLIAMS, individually and as caseworker, Child Welfare Administration, Veronica James, individually and as caseworker, Child Welfare Administration, Doby Flowers, individually, Marva Livingston Hammons,* as Commissioner of Social Services of the City of New York, Brooke Trent, individually, Claude Meyers,* as Deputy Commissioner of Social Services of the City of New York, City of New York, and New York City Board of Education, Defendants.

No. 91–CV–0037 (DRH).

United States District Court,
E.D. New York,
Hauppauge Division.

Sept. 30, 1994.

---

* Defendants Hammons and Meyers have replaced defendants Flowers and Trent as Commissioner and Deputy Commissioner of Social Services of the City of New York. Accordingly, while Flowers and Trent remain defendants in their individual capacities, Hammons and Meyers are, hereby, substituted as defendants with respect to plaintiffs' claims against Flowers and Trent in their official capacities. Fed.R.Civ.P. 25(d)(1). See Hafer v. Melo, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

964

Carolyn A. Kubitschek, David J. Lansner, Lansner & Kubitschek, New York City, for plaintiffs.

Paul A. Crotty, New York City Corp. Counsel by Bruce Rosenbaum, New York City, for defendants.

## MEMORANDUM & ORDER

HURLEY, District Judge.

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56(b); plaintiffs cross-move for partial summary judgment pursuant to Federal Rule of Civil Procedure 56(a).

Defendants' motion is denied in part and granted in part; plaintiffs' cross-motion is denied.

## BACKGROUND

In September 1989, plaintiffs Marc and Mary Tenenbaum ("the Tenenbaums") en-

rolled their daughter Sarah in kindergarten at P.S. 230 in Brooklyn. Sarah suffers from "elective mutism," meaning that she does not speak to people outside of her home.

At P.S. 230, Sarah often fell asleep and on occasion would cry in the morning in class, according to her teacher, Mary Murphy. (Murphy Dep. at 17–18.) At first, Sarah did not speak to Murphy. Over time, however, Sarah grew comfortable with her, and would show Murphy pictures and speak one- or two-word sentences to her. (Murphy Dep. at 21.)

On January 4, 1990 and January 5, 1990, defendants allege that Sarah communicated to Murphy in words and gestures that her father sexually abused her. On one occasion when Sarah began crying, Murphy asked her if anyone was hurting her and identified a series of people in her life to which she "shook her head no." However, when her father's name was mentioned in the litany of individuals, Sarah's eyes filled "up in tears and she shook her head, yes, and she started to really cry." (Murphy Dep. at 23.) Sarah is said to have pointed to the groin area of one of the dolls in the play area of her classroom when asked by Murphy where her father hurt her. (Murphy Dep. at 24–26.) Defendants also allege, *inter alia*, that Sarah drew a picture of two figures and said to Murphy that one of the figures was her father and that he "kneeled" and "hurt" her, and that she was the other figure, and then she stopped talking. (Murphy Dep. at 27.)

As required by Sections 413 and 415 of the New York Social Services Law, Murphy reported what Sarah had done and said to her superiors at P.S. 230. An official at the school, Susan Raiten, in turn reported the matter to the New York State Department of Social Services' ("the State DSS's") Central Register of Child Abuse and Maltreatment by telephone in the morning of Friday, January 5, 1990. (Raiten Dep. at 13.) An operator at the State DSS recorded the call on a DSS Form 2221 ("2221 Report"). The 2221 Report stated, "Sarah is speech and language delayed. Sarah is unable to stay awake during the day. Ch[ild] often naps off and on all day. Ch[ild] is nervous and withdrawn. Ch[ild] is afraid of fa[ther]. Fa[ther] hurts her vaginal area at night."

As required by state law, the State DSS forwarded the 2221 Report to defendant Nat Williams, a supervisor in the child protective unit of the New York City Child Welfare Administration ("the CWA") Brooklyn field office. Williams received the report on the day it was made, Friday, January 5, 1990, and on the same day assigned the case to defendant Veronica James, a newly-hired caseworker under his supervision. (Williams Dep. at 37.)

Williams instructed James to contact Murphy to verify the allegations contained in the 2221 Report. He also told James to visit the Tenenbaums' home. James attempted to contact Murphy later on Friday, but she had already left for the day. James then visited the Tenenbaum home with a co-worker named Thomas O'Connell.

When the caseworkers arrived at the Tenenbaum home on Friday evening, they told the Tenenbaums that they were there to investigate a report that Sarah had been absent from school and was developmentally delayed. (James Dep. at 11.) They did not inform the Tenenbaums of their suspicion of sexual abuse. (Mary Tenenbaum Decl. at ¶ 13.) James and O'Connell interviewed the Tenenbaums at length (Mary Tenenbaum Decl. at ¶ 15), and the Tenenbaums informed the caseworkers that Sarah was being treated at Maimonides Hospital for her speech and developmental problems. The Tenenbaums gave James the names of the pediatricians caring for Sarah and her younger brother, Aaron, and signed releases for their medical records. (James Dep. at 16.) They also informed the caseworkers that they had an ongoing dispute with officials at P.S. 230 over plans for Sarah's education, and believed that the report of Sarah's absence and developmental problems was made to retaliate for their refusal to go along with the school's plans. (*Id.* at 11; Mary Tenenbaum Decl. at ¶ 14.) The Tenenbaums partially undressed their children so that James and O'Connell could inspect them for any bruises or marks on their chests, backs or extremities. The caseworkers found no signs of maltreatment or abuse. (James Dep. at 14–

15; O'Connell Dep. at 18.) No effort was made to inspect either child's genital area.

No further action on the Tenenbaum case was taken over the weekend. On Monday, January 8, 1990, James visited P.S. 230 to interview Murphy and Sarah. Murphy related the evidence of abuse she had gathered from Sarah on January 4, 1990 and January 5, 1990. When Murphy, with James present, asked Sarah whether her father touched her near her vagina and hurt her, however, Sarah shook her head "no." (James Dep. at 22–25.) In fact, she responded to all of the questions asked of her that day by Murphy by shaking her head "no," including the question "[d]oes your mother bathe you." *Id.* Murphy also reported to James that a gym teacher had noticed a red mark on Sarah's thigh several weeks earlier. (Murphy Dep. at 36.) The Tenenbaums allege that the gym teacher could have seen the mark only by undressing Sarah because she always wore opaque tights to school. (Mary Tenenbaum Decl. at ¶ 21.)

After leaving the school, James reported what she had learned to Williams. He instructed her to go to P.S. 230, to effect an emergency removal of Sarah pursuant to Social Services Law § 417 and Family Court Act § 1024, and to take her to Coney Island Hospital to be examined by doctors for possible sexual abuse. (James Dep. at 28.)

James and Williams made no effort to seek judicial authorization prior to removing Sarah, although Williams testified that a court order can be obtained within one day. (Williams Dep. at 128.)

In the afternoon of Tuesday, January 9, 1990, James visited P.S. 230 and gave the school officials a form which indicated that she was taking Sarah into protective custody in accordance with state law. (Oberferst Dep. at 39.) James then took Sarah to Coney Island Hospital.

At the hospital, a pediatrician and a gynecologist conducted an examination of Sarah. The doctors found no evidence of sexual abuse.

While James and Sarah were at Coney Island Hospital, Williams contacted Mary Tenenbaum by phone to advise her that the CWA had removed her daughter from school. Mary Tenenbaum contacted her husband and went to meet with Williams at his office. Marc Tenenbaum arrived later. The Tenenbaums assert that Williams spoke very rudely to them. He allegedly warned them that they would not get Sarah back, that Mary Tenenbaum was an unfit mother, and that Marc Tenenbaum was a sex abuser. (Mary Tenenbaum Decl. at ¶¶ 28–29.)

At the conclusion of Sarah's examination at Coney Island Hospital, James took her to the CWA's Brooklyn field office, where Sarah met her parents at about 7:30 to 8:30 p.m. (Mary Tenenbaum Decl. at ¶ 32.)

Later that evening, Williams told the Tenenbaums that the CWA would not file charges and that they could take Sarah home because the medical examination did not find evidence that the child had been sexually abused. (Mary Tenenbaum Dep. at 241.)

Ultimately, Williams marked the case "unfounded," (Williams Dep. at 100), and no attempt to remove Sarah from the Tenenbaum home was made.

## DISCUSSION

### I. Standard for Summary Judgment

■ A party should be granted summary judgment only when its moving papers show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of establishing the absence of relevant facts in dispute, and the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987). In addition, "not only must there be no genuine issue as to evidentiary facts, but there must also be no controversy regarding the inferences to be drawn from them." *Id.*

■ Plaintiffs correctly argue that a court generally should not render summary judgment prior to the completion of discovery. Fed.R.Civ.P. 56(f); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980). By order, dated November 1,

1991, Hon. Carol Bagley Amon of this Court issued an order "staying discovery as to *Monell* claims against the City of New York and the New York Board of Education" until completion of the non-*Monell* discovery, at which time permission could be sought to lift the discovery stay as to the remaining claims. As a result, the defendants Flowers, Trent, Hammons, Meyers, and the City of New York have not been deposed or otherwise subject to discovery. Therefore, as to those defendants, the issue of summary judgment will be held in abeyance pending the completion of discovery, unless plaintiffs' claims against one or more of them are clearly ripe for summary judgment now and *Monell*-type discovery could not affect the ultimate outcome.

## II. Elements of Claims Under Section 1983

The Tenenbaums seek damages pursuant to 42 U.S.C. § 1983. To recover, they must show (1) "that some person has deprived [them] of a federal right" and (2) "that the person who has deprived [them] of that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). To recover against employees of the City of New York in their individual capacities, plaintiffs must also be prepared to resist the asserted affirmative defenses of qualified immunity. *Id.*

### Qualified Immunity

■ The individual defendants James, Williams, Flowers and Trent will be entitled to immunity if they can show that (1) "it was not clear at the time of the official acts that the interest asserted by the plaintiff was protected by a federal statute or the Constitution," or (2) "it was not clear at the time of the acts at issue that an exception did not permit those acts," or (3) "even if the contours of the plaintiffs' federal rights and the official's permissible actions were clearly delineated at the time of the acts complained of, the defendant[s] may [still] enjoy qualified immunity if it was objectively reasonable for

[them] to believe that [their] acts did not violate those rights." *Robison v. Via*, 821 F.2d 913, 920–21 (2d Cir.1987). As to this third prong, courts have explained that a defendant is entitled to summary judgment if the defendant " 'adduce[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[ ]' to believe that he was acting in a fashion that did not clearly violate an established federally protected right." 821 F.2d at 921 (quoting *Halperin v. Kissinger*, 807 F.2d 180, 189 (D.C.Cir.1986)).

### Supervisor Liability

■ Plaintiffs assert individual claims against Doby Flowers and Brooke Trent, the former Commissioner and former Deputy Commissioner, respectively, of the Department of Social Services of the City of New York. As individuals, Flowers and Trent can be liable only if they were personally responsible for violations of plaintiffs' rights, by, *inter alia*, promulgating unconstitutional policies or plans, or otherwise authorizing or approving the challenged misconduct. *See Rizzo v. Goode*, 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976) (superior can be liable for constitutional violation resulting from policy or order); *Duchesne v. Sugarman*, 566 F.2d 817, 831 (2d Cir.1977) (superiors could be liable for policy-making); *Meriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir.1989) (supervisor liable when he or she has actual or constructive notice of an unconstitutional practice and demonstrates "gross negligence or deliberate indifference" by failing to act).

### Municipal Liability

■ Plaintiffs also assert claims against the City of New York, Marva Livingston Hammons and Claude Meyers [1] in their official capacities, as the Commissioner, and Deputy Commissioner of New York City Social Services respectively, and against the

---

1. As noted previously, Hammons and Meyers replaced Flowers and Trent as Commissioner and Deputy Commissioner of Social Services of the

City of New York after the present action was commenced.

New York City Board of Education. The claims against Hammons and Meyers, as well as the claims against James and Williams in their official capacities as caseworkers, are the equivalent of claims against New York City. *Hafer v. Melo*, 502 U.S. 21, ―― ――, 112 S.Ct. 358, 361–62, 116 L.Ed.2d 301 (1991). The Tenenbaums could recover against New York City or the Board of Education based on their authorization of unconstitutional acts, approval of unconstitutional customs, or failure to train. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (city can be liable for unconstitutional policy promulgated by its officers); *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (complaint asserting failure to train as a result of deliberate indifference to constitutional rights states a claim for relief). While the city and its agencies cannot be held liable based on *respondeat superior, Monell*, 436 U.S. at 694 n. 58, 98 S.Ct. at 2037 n. 58, they are not permitted to assert the defense of qualified immunity that is available to the individual defendants. *Smith v. Wade*, 461 U.S. 30, 32–33, 103 S.Ct. 1625, 1627–1628, 75 L.Ed.2d 632 (1983).

### III. Due Process Claims

#### A. Substantive Due Process

The Tenenbaums first argue that defendants' removal of their daughter from school to be examined for abuse violated their Fourteenth Amendment right to substantive due process.

Plaintiffs' substantive due process claim derives from "the right of the family to remain together without the coercive interference of the awesome power of the state." *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir.1977). This right is fundamental. *Joyner v. Dumpson*, 712 F.2d 770, 778 (2d Cir.1983).

■ Although fundamental, a constitutional violation of the right to family integrity occurs only if defendants' actions "significantly interfere" with plaintiffs' family integrity. *Zablocki v. Redhail*, 434 U.S. 374, 386, 98 S.Ct. 673, 681, 54 L.Ed.2d 618 (1978). For example, in *Joyner*, the Second Circuit

found that a statute which required that parents wishing to obtain state-subsidized residential care for their children temporarily transfer custody to the state did not significantly interfere with the parents' right to family integrity. 712 F.2d at 778.

■ Similarly, in *Fitzgerald v. Williamson*, 787 F.2d 403, 408 (8th Cir.1986), the Eighth Circuit held that no substantive due process violation occurred where caseworkers had arranged for a psychologist to examine a child who was allegedly abused. *See also Doe "A" v. Special School Dist.*, 637 F.Supp. 1138, 1146 (E.D.Mo.1986) (detention by bus driver for several hours did not infringe right to family integrity).

As in *Joyner, Fitzgerald* and *Doe "A"*, defendants' deprivation of the Tenenbaums of their child for a single afternoon for a medical examination did not significantly infringe their fundamental right to live together without interference from the state.

All defendants are therefore entitled to summary judgment on this claim.

#### B. Procedural Due Process

##### 1. Removal of the Child from School

■ The Tenenbaums also allege that defendants deprived them of their right to procedural due process. In *Robison v. Via*, the Second Circuit held that

it [is] clearly established that a parent's interest in the custody of his or her children [is] a constitutionally protected "liberty" of which he or she [can]not be deprived without due process, which [ ] generally require[s] a predeprivation hearing. However, it [is] equally well established that officials may temporarily deprive a parent of custody in "emergency" circumstances "without parental consent or a *prior* court order."

821 F.2d 913, 921 (2d Cir.1987) (emphasis in original) (citations omitted).

In the present case, James and Williams relied on Section 1024 of the New York Family Court Act in removing Sarah from school on January 9, 1990. That Section provides that a child may be removed, absent parental consent or a court order, if there is

"reasonable cause to believe that the child is in such circumstances or condition that his continuing in said place of residence or in the care and custody of the parent ... presents an imminent danger to the child's life or health," and there is insufficient time to obtain prior judicial authorization for the removal pursuant to Section 1022 of the Family Court Act.[2]

Plaintiffs claim defendants violated state law in removing Sarah. Given the chronology in this case, it may be that James and Williams had sufficient time to obtain a Section 1022 court order. Such an order, according to Williams, could have been obtained within one day. (Williams Dep. at 128.) However, whether the procedure embodied in Sections 1022, or 1024, or another Section of the Family Court Act should have been followed by CWA has little, if any, bearing on the issue before the court. As noted by now Chief Judge Newman, writing for the Second Circuit in *Doe v. Connecticut Dep't of Child and Youth Servs.*:

> Appellants challenge Judge Dorsey's conclusion ... [in granting summary judgment to defendants, upon the ground] that factual issues remain as to whether the defendants fully complied with the requirements of state law. Even if true, the claim is irrelevant. The question is whether 'no reasonable jury, looking at the evidence most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[s]' to believe that [they were] acting in a fashion that did not clearly violate an established *federally* protected right.

911 F.2d 868, 869 (2d Cir.1990) (emphasis in original).

The pivotal question, then, is whether Sarah's removal was justified as an appropriate response to a legitimately perceived emergency. If so, neither parental consent nor prior judicial approval was required. The meaning of the word "emergency" in the present context is explained in *Hurlman v. Rice*, 927 F.2d 74, 80 (2d Cir.1991) thusly:

the child is immediately threatened with harm, ... for example ... where there is evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence....

A juxtapositioning of the *Hurlman* standard with the specific information that Sarah communicated to her teacher, and which the teacher reiterated to James, indicates that an emergency existed, even if the child's claimed recantation before James is taken into account. A CWA worker, in possession of the above information, would have reasonable cause to conclude that Sarah had been a victim of sexual abuse by her father, and that returning the child to her home would place her at imminent risk for further abuse. *See, e.g., Cecere v. City of New York,* 967 F.2d 826, 830 (2d Cir.1992) ("temporary assertions of custodial authority in the face of a reasonably perceived emergency do not violate due process"); *Doe v. Connecticut Dep't of Child and Youth Servs.,* 911 F.2d 868 (2d Cir.1990); *Lossman v. Pekarske,* 707 F.2d 288, 291 (7th Cir.1983) ("[w]hen a child's safety is threatened, that is justification enough for action first and hearing afterwards"); *Chayo v. Kaladjian,* 844 F.Supp. 163, 171 (S.D.N.Y.1994) ("[T]he Caseworkers had sufficient reason to believe that the Chayo children might be in imminent danger. The steps they took [i.e. temporary removal of children from parents' home for medical examination without court order or parental consent] in light of the information available to them and the risk of danger to the Chayo children were reasonable. Consequently, the plaintiffs were not deprived of due process by this temporary removal.")

It should be noted that the substance of what the child communicated to Murphy, and what Murphy, in turn, told James is essentially uncontroverted, viz. that Sarah's father hurt her through contact with her vaginal area at night. Being unable to factually call into question the substance of the message, plaintiffs seek to create a factual issue via an assault on the messenger:

---

**2.** Section 1022 provides that a family court judge may issue an order directing the temporary removal of a child from his or her home, before a child abuse or neglect petition is filed, upon a finding that an emergency exists.

Mary Murphy, the source of the charge that plaintiff Marc Tenenbaum harmed his daughter, was not a reliable informant who had provided valuable or accurate information to the defendants in the past. *See, e.g., Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.[2d] 723 (1964), *U.S. v. Pea [Pena],* 961 F.2d 333, 338, note 2 (2d Cir.1992). Instead, Murphy was a novice school teacher, who had never before been involved in a child abuse investigation, and who had no prior contact whatsoever with the defendants or any other employees of the Child Welfare Administration.

(Pls.' Apr. 23, 1993 Mem. in Opp. at 23.)

Plaintiffs cite only criminal cases in support of their argument that if CWA workers "possess only uncorroborated information from an informant of untested reliability, they do not have probable cause...." (Pls.' June 1, 1993 Reply Mem. at 7.) The present case, of course, is civil. The person speaking to James is a non-anonymous public school teacher, charged with a statutorily-created responsibility to report suspected incidents of child abuse. She would have no reason to fabricate, or otherwise color the nature of her communications with Sarah.[3] And James would have no reason to reject the information provided by Murphy *simply* because she had no prior contact with CWA and, therefore, could not be labelled as a "reliable informant" as that term is used in the field of criminal law. If that were a precondition to a finding of probable cause in a child abuse case, CWA would be unable to effect an emergency removal even if, for example, a teacher saw a parent commit a particularly heinous sexual act upon his or her child as they entered their home absent some type of independent proof confirming the accuracy of the teacher's report, unless that teacher had prior, and positive, contacts with CWA.

No authority has been advanced for the proposition that such a stringent standard is an essential component to a finding of probable cause in a child abuse case, and the court rejects the argument that it is.

One further argument raised by the plaintiffs warrants comment, that being whether the defendants' conduct in not removing the child until January 9th belies the existence of a claimed emergency.

To place this argument in context, a brief reiteration of certain facts is necessary. Based on Sarah's communications to Murphy, a report was made to the State Central Register on the morning of Friday, January 5th. The report was, in turn, faxed that same day to the CWA Brooklyn Field Office. Williams assigned the case to James and told her to contact the source of the information in an effort to verify its accuracy. James was unsuccessful in her efforts to reach Murphy on Friday afternoon, but did establish contact on Monday, January 8th. At that time, Murphy told James of the information she had received from Sarah. That information was relayed from James to Williams who instructed her to remove the child from school and have her medically examined, which was done on Tuesday, January 9, 1990.

The delay in this case appears to be reasonable. The three day hiatus between receipt of the report and the call for removal was occasioned by, *inter alia,* CWA's decision not to act until Murphy, as the source of the report, was personally interviewed. But assuming, *arguendo,* that there was no reason to wait three days before acting, does this delay invalidate the claim of emergency? The holding in *Doe v. Connecticut Dep't of Child and Youth Servs.* compels a negative answer to that question, as evidenced by the following excerpt:

> Nor does the fact that the defendant waited three days from receipt of the psychologist's report before invoking their authority under the state statute preclude the availability of qualified immunity. The suit sought damages for the removal of the child, not the delay in taking such action. The removal *remained* objectively reasonable when it was undertaken.

911 F.2d at 870 (emphasis added).

In sum, the court finds, as a matter of law, that the information provided by Murphy to James established reasonable grounds for

---

**3.** No evidence has been elicited to even remotely lend credence to plaintiffs' claim that Murphy fabricated the entire scenario "because of ... past disagreements with plaintiffs." (*See* Compl. at ¶ 21.)

the emergency removal of Sarah. Accordingly, none of the defendants violated a due process right of any of the plaintiffs. That being the case, James and Williams, as well as all of the other defendants are entitled to summary judgment on this, the first prong of the plaintiffs' procedural due process claim.

■ Before proceeding to the question of whether plaintiffs' procedural due process rights were compromised by the manner in which Sarah was subjected to a medical examination, qualified immunity—as an *alternate* ground for granting summary judgment to James, Williams, Flowers and Trent will be discussed. Even if, *arguendo*, a material issue of fact were to be gleaned from the materials before the court, thereby precluding an award of summary judgment to all defendants vis-a-vis Sarah's removal, the caseworkers, together with Flowers and Trent would still be entitled to such relief under the doctrine of qualified immunity.

To partially reiterate, qualified immunity is available to a defendant if his or her conduct, *inter alia*, was objectively reasonable *or if* "officers of reasonable competence could disagree on whether the probable cause test was met." *Robison*, 821 F.2d at 921. Measured against the second part of that standard, which recognizes the "Hobson's choice" often confronting those involved in the investigation of child abuse charges, *van Emrik v. Chemung County Dep't of Social Servs.*, 911 F.2d 863, 866 (2d Cir.1990), James, Williams, Flowers and Trent may not legitimately be called upon to answer in damages for the events of January 1990. A juxtapositioning of the previously explained activities of James and Williams against the doctrine of qualified immunity compels that conclusion.[4]

## 2. Interference with Right to Choose Medical Treatment

The Tenenbaums also assert that defendants unconstitutionally interfered with their parental rights by having a pediatrician and gynecologist at Coney Island Hospital examine Sarah. Given the highly intrusive nature of this particular examination, which was solely for investigative purposes, the Court agrees.

■ Although Sarah's removal was based on probable cause to believe that an emergency existed, that circumstance ceased upon her custody being temporarily vested in CWA. She was then no longer in what was perceived to be harm's way. Thereafter, procedural due process required notice to the parents and judicial authorization before Sarah could be subjected to an inspection of her vagina and surrounding area. *See van Emrik v. Chemung County Dep't of Social Servs.*, 911 F.2d 863, 867 (2d Cir.1990) ("[w]e believe the Constitution assures parents that, in the absence of parental consent, x-rays of their child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances"); *cf. Chayo v. Kaladjian*, 844 F.Supp. at 169 ("The instant case [*Chayo* ] is distinguishable ... [from *van Emrik* ] because the x-ray examinations [of the Chayo child] were ordered not by the caseworkers but by Doctor Ibrahm Ahmed, a pediatric resident at St. Vincent's Hospital, and for medical rather than investigative purposes.").[5]

Defendants argue that *van Emrik* is "factually distinguishable from the case at bar and is, therefore, inapplicable to this case." (Defs.' Mar. 5, 1993 Mem. at 19–20.) Granted, the medical examination of Sarah did not involve any physical risk, unlike the long-

---

**4.** Although discovery of Flowers and Trent has not commenced, it is clear—as explained above—that their activities vis-a-vis Sarah's removal, if any, are not actionable due to the defense of qualified immunity. If they are deposed, the purpose will be to elicit information bearing upon the question of liability of the City of New York with respect to the medical examination of Sarah.

**5.** Note that Sarah's case, unlike that of the child in *Chayo*, is factually akin to *van Emrik* in that a caseworker directed that a medical examination be conducted, which was done solely for investigative purposes.

bone x-rays in *van Emrik* which did entail some possible risk of physical harm. But that fact does not render the rationale and holding of *van Emrik* irrelevant for present purposes. Here, as in *van Emrik*, time—following the emergency removal—permitted parental and judicial involvement prior to the medical examination being conducted. Harm to a child cannot legitimately be defined to exclude significant, and objectively reasonable emotional trauma. As noted in *Doe v. Renfrow*, "[i]t does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human dignity." 631 F.2d 91, 92–93 (7th Cir.1980) (emphasis added), *cert. denied*, 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981); *see generally* Shatz, Donovan & Hong, *The Strip Search of Children and the Fourth Amendment*, 26 U.S.F.L.Rev. 1, 11–14 (1991) (a strip search, for a child, is "akin to sexual abuse.").

Sarah was subjected to intrusive bodily examinations by two strangers, in a strange location, in the absence of a parent or other reassuring figure. While the child in *van Emrik* faced the possibility of physical injury, Sarah, almost certainly, did, in fact, experience psychological injury on January 9, 1990.

Defendants maintain that the expedited procedure employed by CWA on that date actually benefited plaintiffs by abbreviating the interval between Sarah's removal and return to her family. (Defs.' Mar. 5, 1993 Mem. at 20–21.) This argument trivializes the constitutional implications of the State subjecting a person to an investigatory, intrusive medical examination without notice, and an opportunity to be heard, within the context of a judicial proceeding.

 In sum, plaintiffs have established, as a matter of law, that their procedural due process rights were violated by the manner in which Sarah was subjected to a medical examination on January 9, 1990. However, in *van Emrik*, the Second Circuit found the individual defendants immune because the law was not settled at the time the events in that case occurred. The events at issue in the present case also occurred when the law establishing this right was not settled, prior to the Second Circuit's decision in *van Emrik*. The individual defendants here, as in *van Emrik*, are therefore immune from suit. Accordingly, Williams, James, Flowers and Trent are entitled to summary judgment on this claim. The City of New York, however, not having the benefit of the qualified immunity defense, may still be liable to the Tenenbaums under the principles of municipal liability previously discussed.

## IV. Fourth Amendment Claims

### A. Seizure of the Child from School

The Tenenbaums also allege that defendants' removal of Sarah from school violated her Fourth Amendment right to be free from unreasonable seizures because defendants lacked probable cause to believe she had been abused.

 While at least one court has questioned whether taking custody of a minor is violative of the child's liberty interest (on the theory that custody is merely transferred from the parent to the state), *see Lossman v. Pekarske*, 707 F.2d 288 (7th Cir.1983), the sounder view, and apparently the law in this Circuit, is that the state's assumption of custody is a seizure under the Fourth Amendment. *See van Emrik*, 911 F.2d at 867 ("That interest [viz. the parents' decision-making role concerning medical procedures for child] assumes special significance when the procedures undertaken at the initiative of a state official serve primarily an investigative function; in such circumstances, Fourth Amendment and bodily integrity interests of the child are implicated, interests the parents are entitled to assert on the child's behalf.") (citations omitted); *cf. Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir.1993) (" 'Although confinement of the mentally ill by state action is generally analyzed under the due process clause of the fourteenth amendment, we analyze the distinct right to be free from an unreasonable government seizure of the person for whatever purpose' ") (quoting *Maag v. Wessler*, 960 F.2d 773 (9th Cir.1991)). The seizure of Sarah, then, implicates her Fourth Amendment rights.

■ The same may not be said of her parents to the extent that they have sued individually, as well as on Sarah's behalf. Neither Marc nor Mary Tenenbaum has been the subject of a search or a seizure. *See Donald v. Polk County,* 836 F.2d 376 (7th Cir.1988) (the "removed" child, her parents and her siblings sued the Polk County Department of Social Services under 42 U.S.C. § 1983, claiming, *inter alia,* a violation of their Fourth Amendment rights; court held that "[n]one of the plaintiffs in this case have [sic] been the object of a search and seizure, with possible exception of ... [the child]," thereby impliedly rejecting the notions that a parent suffers derivative harm, and that a child constitutes an "effect," for Fourth Amendment purposes.). Moreover, the Court is not aware—based on its own research and the submissions of counsel—of any federal decision which has held that a parent may legitimately assert an individual, as distinct from representative, Fourth Amendment claim based upon the seizure of a child.

A parent's protection under such circumstances is to be found elsewhere in the Constitution, often in the due process clause of the Fourteenth Amendment. That is the situation with respect to Marc and Mary Tenenbaum.

■ Given that defendants' conduct falls within the ambit of the Fourth Amendment as to Sarah, this court must consider what standard to apply in judging the constitutionality of the seizure. The Supreme Court has not had occasion to answer the question of whether probable cause, or some lesser standard, governs the removal of children in cases of suspected abuse or neglect, and the Second Circuit has written little on the subject.[6]

Searches and seizures effected by police for law enforcement purposes may occur only pursuant to a warrant[7] supported by probable cause unless within "a few specifically established and well-delineated exceptions." *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971) (citations omitted).

Outside the realm of criminal law, however, the Supreme Court has approved searches and seizures on less than probable cause where the government has " 'special needs, beyond the normal need for law enforcement.' " *O'Connor v. Ortega,* 480 U.S. 709, 720, 107 S.Ct. 1492, 1499, 94 L.Ed.2d 714 (1987) (quoting Blackmun, J., concurring in *New Jersey v. T.L.O.,* 469 U.S. 325, 351, 105 S.Ct. 733, 747, 83 L.Ed.2d 720 (1985)). In such cases, searches and seizures remain subject to the general reasonableness requirement of the Fourth Amendment. *T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 742.

The Supreme Court has used special needs to justify departure from the requirements of probable cause and a warrant when special needs " 'make the warrant and probable-cause requirements *impracticable.*' " *O'Connor,* 480 U.S. at 720, 107 S.Ct. at 1499 (quoting Blackmun, J., concurring in *T.L.O.,* 469 U.S. at 351, 105 S.Ct. at 747 (emphasis added)). Alternatively, the Court has stated that it will dispense with a warrant and probable cause when they are " '*likely to frustrate* the governmental purpose behind the search.' " *O'Connor,* 480 U.S. at 720, 107 S.Ct. at 1499 (quoting *Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 533, 87 S.Ct. 1727, 1733, 18 L.Ed.2d 930 (1967) (emphasis added)). In

---

**6.** What guidance there is from the Second Circuit, however, seems to indicate that "probable cause" is the standard. *van Emrik,* 911 F.2d at 867; *Doe v. Connecticut Dep't of Children and Youth Servs.,* 712 F.Supp. 277, 284 (D.Conn. 1989) ("The emergency removal of John Doe requires 'probable cause' to believe that he was in immediate physical danger from his surroundings and that removal was necessary to insure his safety."), *aff'd,* 911 F.2d 868 (2nd Cir.1990).

**7.** Throughout this decision, the word "warrant" and the term "judicial authorization" will be used interchangeably as synonyms, with the understanding that a judicial authorization in the present context, and thus a "warrant," might consist of, *inter alia,* an oral court order given over the telephone, followed by a confirmatory written order. Parenthetically, such a practice was often utilized—with the telephone call being taped—in the Family Court of Suffolk County for Section 1022 applications under the Family Court Act (*see* p. 970, n. 2 *supra* ) when the author of this opinion served in that court in the early– to mid–1980s.

another case, the Court held that a warrant was not required where it would "interfere to an appreciable degree" with the government scheme. *Griffin v. Wisconsin*, 483 U.S. 868, 876, 878, 107 S.Ct. 3164, 3170, 3170, 97 L.Ed.2d 709 (1987).[8]

Should a lesser standard than probable cause and a warrant be utilized in child abuse cases, due to special needs making the requirements "impracticable," or likely to "frustrate the governmental purpose" behind the search, or likely to "interfere to an appreciable degree" with the government goal involved?

Before endeavoring to answer that question, it may be helpful to try and determine the likely impact of the application of the probable cause/warrant standard on society's efforts to combat abuse and neglect of its children. That process should shed light on whether any one or more of the above mentioned grounds for relaxing those requirements is applicable in the present context. If so, perhaps a lesser standard should control. But if not, no justification exists for a departure from the constitutional norm.

## Probable Cause

Probable cause requires only that a magistrate "make a practical, commonsense decision whether, given all the circumstances ... before him [or her] ... there is a fair proba-

bility that the facts to which the probable cause determination is addressed exist." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). The application of this standard should not hinder child abuse investigations. Abusive or neglectful conduct witnessed by neighbors and other identified individuals, and signs of abuse in the appearance and behavior of children detected by teachers and child care workers, routinely provide probable cause to believe that a child has been abused or neglected.

The feasibility of a probable cause requirement is supported by the law of New York, which requires that before a child may be removed, in an emergency situation, government officials possess "reasonable cause," the equivalent of probable cause,[9] to believe the child is in danger of harm. N.Y.Fam.Ct.Act § 1024. Thus, had Williams and James, contrary to the fact, lacked probable cause to believe Sarah was in danger at the time James removed her from school, they would have violated state law in addition to the Constitution.

One concern of a probable cause requirement is that anonymous reports alone would not justify searches or seizures in furtherance of an investigation. Assuming that such

---

**8.** In each case where the Court has found special needs to justify lifting the warrant and probable cause requirements, it has analyzed separately the burdens imposed by each requirement.

In *T.L.O.*, the court approved searches of school children subject only to a requirement of reasonableness. The Court held that probable cause was not required based on the need to relieve teachers of the burden of learning "the niceties of probable cause," 469 U.S. at 343, 105 S.Ct. at 743, and to allow them "freedom to maintain order." *Id.* at 341, 105 S.Ct. at 742. It held that the warrant requirement would "unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools." *Id.* at 340, 105 S.Ct. at 742.

In *O'Connor*, the Court dispensed with the warrant requirement in the search of a government employee's office because "requiring an employer to obtain a warrant whenever the employer wished to enter an employee's office, desk, or file cabinets for a work-related purpose would seriously disrupt the routine conduct of business and would be unduly burdensome." 480 U.S. at 722, 107 S.Ct. at 1500. Probable cause was not required because it would cause "the work of

[government] agencies [to] suffer." 480 U.S. at 723, 107 S.Ct. at 1500.

In *Griffin*, the Court held that a probationer's home could be searched without probable cause or a warrant because those requirements would "make it more difficult for probation officials to respond quickly to evidence of misconduct," would substitute a magistrate for the probation officer "as the judge of how close a supervision the probationer requires," and "would reduce the deterrent effect of the supervisory arrangement." 483 U.S. at 876–79, 107 S.Ct. at 3169–71.

**9.** *People v. Stockman*, 159 Misc.2d 730, 734 n. 4, 606 N.Y.S.2d 864, 867 n. 4 (Justice Ct.1993). *See also, People v. Hetrick*, 80 N.Y.2d 344, 349–50, 604 N.E.2d 732, 735, 590 N.Y.S.2d 183, 186 (1992) (reasonable cause and probable cause to arrest are used interchangeably). Reasonable cause in family court proceedings is the equivalent of reasonable cause in criminal cases. *Commissioner of Social Services ex rel. Riddle v. Rapp*, 127 Misc.2d 835, 487 N.Y.S.2d 477, 481–82 (Fam.Ct.1985).

a report were sufficiently corroborated, however, it would pass constitutional muster. *Gates,* 462 U.S. at 241–43, 103 S.Ct. at 2333–35. While uncorroborated, anonymous tips could not provide probable cause, *Gates,* 462 U.S. at 227, 103 S.Ct. at 2326, this court does not believe that the seizure of a child based on such tips, possibly motivated by malice, comports with the Fourth Amendment. Even under the lesser standard of reasonable suspicion, which is the sole alternative to probable cause in this case,[10] an entirely uncorroborated anonymous tip would generally not provide grounds for a search or seizure. *Alabama v. White,* 496 U.S. 325, 329, 110 S.Ct. 2412, 2415, 110 L.Ed.2d 301 (1990).

The Supreme Court has rejected probable cause in some cases, in part, to relieve government officials such as school teachers and administrators and public employers of "the necessity of schooling themselves in the niceties of probable cause." *T.L.O.,* 469 U.S. at 343, 105 S.Ct. at 744; *see also O'Connor,* 480 U.S. at 724, 107 S.Ct. at 1501. Caseworkers investigating child abuse, however, like police officers, routinely conduct investigative seizures and searches. Requiring familiarity with the Fourth Amendment will not, therefore, be unduly burdensome.

In *Wyman v. James,* 400 U.S. 309, 317–19, 91 S.Ct. 381, 385–87, 27 L.Ed.2d 408 (1971), the Supreme Court held that a child welfare visit by a caseworker to the home of a government benefit recipient, if, *arguendo,* a search, did not require probable cause. In *Wyman,* however, the court based its decision on the fact that the home visit by the caseworker was primarily rehabilitative, that it was "not forced or compelled," and that the state was entitled to place conditions on the award of benefits to insure their proper use. *Id.* By contrast, the seizure in the present case was for investigative purposes, plaintiffs had no right or opportunity to oppose it, and no public monies were involved. *Wyman*

does not, therefore, support a standard less than probable cause in the present case. *See Investigating Child Abuse: The Fourth Amendment and Investigatory Home Visits,* 89 Colum.L.Rev. at 1051–53 (arguing that *Wyman* is inapposite to child abuse investigation searches and seizures).

**Warrant**

Like probable cause, a warrant is unlikely to frustrate the state's attempts to investigate child abuse. New York law mandates judicial authorization to seize a child absent an emergency, and this requirement is complied with on a routine basis without deleterious consequences. *See* N.Y.Fam.Ct.Act § 1022 (pertaining to court order for temporary removal of child before petition charging abuse or neglect filed) and § 1024 (pertaining to "emergency removal[s] without court order"); *see also* Besharov, Practice Commentary to N.Y.Fam.Ct.Act § 1022 at 314 (1983).

In sum, upon analysis of the burdens they would impose, it appears that neither probable cause, nor a warrant in the sense of prior oral or written judicial authorization (*see* discussion *supra* at 974 n. 7), is "impracticable," or likely to "frustrate the governmental purpose" or "interfere to an appreciable degree" with the government goal of effectively addressing the child abuse problem. Therefore, the court concludes that the probable cause and warrant requirements apply to child abuse searches and seizures under the Fourth Amendment.

◼ Returning to the present case, probable cause existed for Sarah's emergency removal on January 9, 1990 and accordingly, her Fourth Amendment rights were not violated by the removal.

◼ Alternatively, the individual defendants in this case are entitled to qualified immunity because the application of the probable cause and warrant requirements to

**10.** Were the court to dispense with probable cause, some degree of individualized suspicion would still be required to allow seizures of children. In *United States v. Montoya de Hernandez,* 473 U.S. 531, 541, 105 S.Ct. 3304, 3310, 87 L.Ed.2d 381 (1985), the Supreme Court rejected the creation of a third standard of individualized

suspicion in addition to probable cause and reasonable suspicion as inconsistent with "the Fourth Amendment's emphasis upon reasonableness" and because "subtle verbal gradations may obscure rather than elucidate the meaning of the provision in question."

child abuse investigations by caseworkers was unsettled at the time of defendants' investigation, and still, as noted at pages 973 and 974, *supra*, is unclear. Even if the general principles of law were sufficiently defined in January 1990 to place potential defendants on notice, the individual defendants here would still be immune from civil liability "because it was objectively reasonable for them to believe they violated no . . . [Fourth Amendment] rights when they seized . . . [Sarah]." *Robison*, 821 F.2d at 921.

While the Courts in *Franz v. Lytle*, 997 F.2d 784 (10th Cir.1993), and *Good v. Dauphin County Social Servs.*, 891 F.2d 1087, 1094 (3d Cir.1989), held that Fourth Amendment jurisprudence was sufficiently well developed to place persons investigating child abuse on notice of its applicability to their work, those cases involved searches or seizures by or with the participation of police officers, whose conduct is regularly governed by the Fourth Amendment. By contrast, in *Landstrom v. Illinois Dep't of Children & Family Servs.*, 892 F.2d 670, 676–77 (7th Cir.1990), and *Darryl H. v. Coler*, 801 F.2d 893, 908 (7th Cir.1986), the Seventh Circuit held that caseworkers were immune from claims under the Fourth Amendment because its application to child abuse investigations was unsettled.

All defendants are entitled to summary judgment. Sarah's removal was the result of a reasonably perceived emergency, coupled with probable cause, thereby being in full compliance with the requirements of the Fourth Amendment. Alternatively, even if, *arguendo*, such were not the case, the individual defendants, viz. Williams, James, Flowers and Trent, would be entitled to summary judgment on the basis of qualified immunity. That defense, of course, is not available to the City.

### B. "Body Cavity" Examination

The Tenenbaums assert that defendants also violated Sarah's Fourth Amendment rights by arranging for doctors at Coney Island Hospital to conduct what plaintiffs label as a "strip search" and a "body cavity" examination of her. Such examinations in a child abuse context have not been addressed by the Supreme Court, and this issue appears to be one of first impression in this Circuit.[11] Semantics aside, the medical examination of Sarah's vagina and surrounding areas is clearly a search within the meaning of the Fourth Amendment.

■ The existence of an emergency, coupled with probable cause, justified Sarah's removal. That emergency did not extend, as noted previously, to the invasive, investigatory examination to which Sarah was thereafter subjected.[12] Therefore, the examination—done without judicial authorization—constituted a violation of the Fourth Amendment.

Decisions by other courts support the requirements of both probable cause and a warrant for intrusive examinations of children for evidence of abuse. In *Good v. Dauphin County Social Servs.*, 891 F.2d 1087, 1092–93 (3d Cir.1989), the Third Circuit held that a strip search of a child as part of an investigation of abuse was constitutional only if conducted pursuant to a warrant issued on probable cause, absent consent or exigent circumstances.

In *Franz v. Lytle*, 997 F.2d 784, 788 (10th Cir.1993), the Tenth Circuit held that a warrant issued on probable cause was required before a police officer investigating alleged

---

11. Plaintiffs cite a variety of cases involving either strip searches or body cavity searches of inmates and arrestees and impliedly analogizes these cases to those involving medical examinations of suspected victims of child abuse.

Defendants' argument simply seeks, unpersuasively, to distinguish *van Emrik* from the case at bar, supplemented by the comment that the "federal removal standard articulated in *Robison v. Via* should be sufficient to permit a medical examination to determine if Sarah was sexually abused." (Defs.' May 20, 1993 Reply Mem. at 24.)

12. In the rare event that investigating officials reasonably believe that evidence of abuse is likely to disappear before a warrant can be obtained, exigent circumstances arguably would permit an intrusive examination without a warrant. *Cf. Schmerber v. California*, 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966) (evanescent nature of defendant's blood-alcohol level permitted blood test without a warrant).

child abuse could constitutionally probe the child's genitals for evidence of abuse and subject her to a medical examination by a doctor.[13]

In contrast to *Good* and *Franz*, the Seventh Circuit in *Darryl H. v. Coler* held that visual inspections of the unclothed bodies of children for evidence of child abuse could be justified without a warrant or probable cause, upon a showing of reasonableness, "balancing ... the need for the particular search against the invasion of personal rights that the search entails." 801 F.2d 893, 902–03 (7th Cir.1986) (citation omitted).

While this court does not necessarily disagree with the holding in *Darryl H.*, it regards the examination in the present case as categorically different from the examination conducted in that case. *See Franz v. Lytle*, 997 F.2d 784, 790–91 (10th Cir.1993) (distinguishing visual inspections and inspections involving touching a child's nude body). Requiring a warrant for a mere visual inspection (following an emergency removal based on probable cause)—particularly of asexual parts of the anatomy—could frustrate child welfare workers in their efforts to uncover child abuse by converting a quick inspection into a time-consuming procedure.

In sum, the invasive search of Sarah—given the fact that the emergency which justified her removal no longer existed at the time of the investigatory medical examination—violated the Fourth Amendment, as well as the procedural due process component of the Fourteenth Amendment as previously discussed.

■ However, as also discussed *supra*, the application of the Fourth Amendment to child abuse investigations was insufficiently established at the time of defendants' investigation to overcome their defense of qualified immunity. Williams, James, Flowers and Trent are, therefore, entitled to summary judgment. That defense is not available to the City of New York. Accordingly, under the circumstances discussed previously, the City might be liable to plaintiffs for the failure to obtain judicial authorization for the medical examination of Sarah.

**13.** The facts of this case are set forth in *Franz v.*

## V. Right to an Adequate Investigation

■ Plaintiffs also assert an independent right to an "adequate investigation" prior to "endangerment" of their constitutional rights. The Constitution affords plaintiffs no such right.

Plaintiffs cite several cases in which courts found searches or seizures to be unreasonable based in part on the failure of government officials to adequately investigate the facts of the case prior to conducting the search or seizure. *E.g., BeVier v. Hucal*, 806 F.2d 123 (7th Cir.1986) (failure to investigate made arrest unreasonable); *Williams ex rel. Williams v. Ellington*, 936 F.2d 881, 888–89 (6th Cir.1991) (school officials would be required to investigate an anonymous tip before conducting a search or seizure). As these cases illustrate, allegations of inadequate investigation are a component of plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures. As stated, *supra*, however, defendants possessed probable cause to seize Sarah. The constitutional flaw associated with the examination arises from the law of judicial authorizations, not from an inadequate investigation. All defendants are therefore entitled to dismissal of this claim.

## VI. Violation of 42 U.S.C. § 671(a)

■ Plaintiffs assert that defendants' failure to make "reasonable efforts" to provide services to preserve their family violates 42 U.S.C. § 671(a). However, the "reasonable efforts" provision of Section 671(a) does not confer a private right of action, nor may it be enforced in an action pursuant to 42 U.S.C. § 1983. *Suter v. Artist M.*, —— U.S. ——, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). Accordingly, all defendants are entitled to summary judgment on this claim.

## VII. Claims by Mary Tenenbaum

■ Plaintiff Mary Tenenbaum argues that, whatever allegations defendants received regarding abuse by her husband, they had no information implicating her, and they therefore violated her rights by removing and examining Sarah. By plaintiffs' reason-

*Lytle,* 791 F.Supp. 827, 829 (D.Kan.1992).

ing, however, a caseworker could remove a child only when all adults residing in the household participate in abuse. That is not the law. Sarah was temporarily removed from the home in which she and the suspected abuser resided. The fact that Mary Tenenbaum also was a member of that household and, therefore, incidentally impacted by the removal, is not violative of her constitutional rights.

## VIII. Claims Against the Board of Education

■ Plaintiffs claim that the New York City Board of Education violated their constitutional rights when its employees (1) participated in James' questioning of Sarah on Monday, January 8, 1990, (2) helped James remove Sarah from school on January 9, 1990, and (3) searched Sarah at some time prior to the report of child abuse.[14] (Pls.' Apr. 23, 1993 Mem. in Opp. at 43–45.)

These activities are said to be the result of Board policies, thereby rendering the Board answerable in damages to the Tenenbaums. More particularly, it is alleged in their complaint that the Board:

1. had a policy of permitting the Department of Social Services to remove children from schools without parental consent, a court order, or the presence of an emergency, and

2. had a policy permitting its employees to conduct strip searches of children in the course of their investigations of child abuse allegations.

As noted earlier, discovery of plaintiffs' *Monell* claims has been stayed. However, Murphy and James have been extensively deposed concerning a number of subjects, including what transpired at the school on January 8th and January 9th, 1990.

As to the claimed complicity of Board employees in the questioning and removal of Sarah from school, it is true that the Board of Education's employees acted pursuant to

its policies in helping James remove Sarah. *See* Regulation of the Chancellor, No. A750, Reports of Suspected Child Abuse and Maltreatment at 4–6 (May 5, 1989). That assistance, however, did not violate plaintiffs' rights. Plaintiffs argue that the Board of Education should be held liable because its employees conspired with James. To establish a conspiracy to violate a person's civil rights, however, a plaintiff must establish that defendants " 'reached an understanding' to violate [plaintiff's] rights." *Strength v. Hubert,* 854 F.2d 421, 425 (11th Cir.1988) (citations omitted); *see also Dahlberg v. Becker,* 748 F.2d 85, 93 (2d Cir.1984) ("meeting of the minds" must occur for a civil rights conspiracy to exist). In the present case, there is no basis for concluding that the employees of the Board of Education reached an understanding with James to deprive the Tenenbaums of their rights under the Constitution. Rather, the Board of Education's employees merely permitted another state official, James, to perform what she believed to be her duties, after being presented with a form indicating that Sarah was being taken into custody pursuant to New York Social Service Law § 417 and New York Family Court Act § 1024. CWA did not need the approval of the Board's employees to effect the removal, and the Board's employees had no right to obstruct the removal.

Moreover, as to the employees' involvement in *both* the questioning and removal of Sarah, any implicated Board policies could not have been a proximate cause of the claimed wrongs. The information before the Court indicates the absence of any material fact which calls into question the propriety of what Murphy and the others at the school did, or did not do, regarding Sarah's removal, notwithstanding the previously mentioned depositions of the individual actors which were conducted by plaintiffs' counsel. Plaintiffs' statements are purely conclusory, devoid of factual underpinnings. Moreover, it must be remembered that the removal by

14. In paragraphs 36 and 37 of the complaint, plaintiffs allege that the Board had a policy of permitting dolls to be used by improperly trained teachers during child abuse investigations. This claim is not addressed by plaintiffs in opposing defendants' motion for summary judgment.

That apparently is not by way of oversight, but rather is attributable to the fact that there is no evidence in the record—including the deposition of Murphy—to support the conclusion that such a policy, if it existed, had any bearing on the alleged constitutional deprivations.

CWA was proper, being based on probable cause and a reasonably perceived emergency.

■ However, plaintiffs' last claim, to wit, that school employees searched Sarah pursuant to Board policy, sometime prior to the CWA investigation, is not subject to summary judgment.

Defendants deny that Sarah was strip-searched by a school employee. Plaintiffs maintain that, at the very least, a factual issue exists as to whether such a search occurred. In support of that proposition, plaintiffs argue the following:

> Defendant Williams himself told Mary Tenenbaum that the school teachers had searched her daughter and found a bruise on the vagina. (Decl. of Mary Tenenbaum, ¶ 24.) Sarah Tenenbaum confirmed the statement when she told her mother that the teachers had undressed her. (Decl. of Mary Tenenbaum, ¶ 22.)

> Moreover, defendant James testified that kindergarten teacher Mary Murphy knew of the strawberry birthmark's on Sarah Tenenbaum's upper leg. (James Dep. at 25.) Murphy could not have been aware of that mark unless she had undressed Sarah. (Decl. of Mary Tenenbaum, ¶ 21.) Williams also said that Murphy had shown James that birthmark. (Williams Dep. at 70.)

(Pls.' Apr. 23, 1993 Mem. in Opp. at 44–45.)

Rule 56(e) of the Federal Rules of Civil Procedure provides, *inter alia,* that affidavits "shall set forth such facts as would be admissible in evidence. . . ." The question, then, is what information have plaintiffs provided which may be considered in determining whether summary judgment is appropriate, i.e. information that "would be admissible in evidence"? Nothing in Mary Tenenbaum's Declaration meets that standard. Her assertions are clearly hearsay. *See* Fed.R.Evid. 801. Moreover, what Williams supposedly said concerning teachers searching Sarah could not be received in evidence because his statement, if made, would not be binding on the Board or any of its employees as an admission, *id.* at 801(d)(2), or otherwise. The daughter's statement similarly is not admissible evidence.

The testimony of James at page 25 of her transcript does not fully dovetail with plaintiffs' representation as to what was said at the deposition. Thus, the transcript, unlike the memorandum of law, never refers to "a strawberry birthmark on Sarah Tenenbaum's upper leg." Rather there is reference to Murphy wanting to show James "something," which Murphy said James had already seen, presumably at the Tenenbaums on the preceding Friday. However, reading that passage in conjunction with page 70 of Williams' deposition suggest that Murphy was talking to James about such a mark. However, there is no evidence in the record to indicate that Murphy ever personally observed the mark. Indeed, she testified that she never did see such a mark. Her testimony on the subject was as follows:

> Q When Mrs. James was at the school the day before on Monday, did you have discussion with her about a mark on Sarah's thigh?

> A I did mention to her that the gym teacher had seen a red mark on her thigh.

> Q Had you ever seen this mark?

> A No.

> Q When did the gym teacher tell you about the mark?

> A Maybe, two or three weeks before.

> Q What is the gym teacher's name?

> A Clint Eubanks.

> Q Is it a man?

> A Yes.

> Q What did Mr. Eubanks tell you exactly?

> A That she was playing around in gym and she was wearing a skirt that day and he noticed that she had a red mark.

(Murphy Dep. at 36.)

The above excerpt from Murphy's deposition creates a material issue of fact. Defendants deny that Sarah was strip-searched. Murphy testified that another school employee, Eubanks, told her that he saw a mark on Sarah's upper thigh. Mary Tenenbaum has indicated that Sarah always wore opaque tights to school, thereby precluding anyone at the school from seeing the mark unless Sarah's tights were first removed.

Granted, the information furnished by Murphy is second-hand. Yet, it would be admissible evidence (thereby satisfying the requirements of Rule 56(e)) as an "admission by a party-opponent" under Rule 801(d)(2)(D).

For the above reasons, this claim against the Board[15]—which pertains to the SEVENTH CAUSE OF ACTION in the complaint—survives defendants' motion for summary judgment.

### IX. State Law Claims

New York provides absolute immunity for state and local employees when they perform discretionary, as opposed to ministerial, functions. *Tango v. Tulevech*, 61 N.Y.2d 34, 40, 459 N.E.2d 182, 185, 471 N.Y.S.2d 73, 76 (1983). The state itself and its subdivisions are also entitled to absolute immunity when an official performs a discretionary function. *Arteaga v. State*, 72 N.Y.2d 212, 216, 527 N.E.2d 1194, 1196, 532 N.Y.S.2d 57, 58–59 (1988). The Court of Appeals defines "discretionary acts" as those which "involve the exercise of reasoned judgment which could typically produce different acceptable results," *Tango*, 61 N.Y.2d at 41, 459 N.E.2d at 186, 471 N.Y.S.2d at 77.

In *Tango*, the Court of Appeals held that the decision of a probation officer to give custody of two children to one of their parents was discretionary in nature, and that she was therefore entitled to absolute immunity. 61 N.Y.2d at 41–42, 459 N.E.2d at 186, 471 N.Y.S.2d at 76–77. While the Second Department has held that negligent placement and supervision of a child in foster care is actionable, *Barnes v. County of Nassau*, 108 A.D.2d 50, 487 N.Y.S.2d 827 (2d Dep't 1985), it specifically distinguished between the discretionary "decision to remove or not to remove a child from its parents" and the placement of a child in foster care, which "must be accomplished in accordance with a governing rule or standard of reasonable care." 108 A.D.2d at 54, 487 N.Y.S.2d at 830. In the present case, Williams and James exercised their discretion when making the decision to interview Sarah, remove her from school, and subject her to a medical examination. Their decisions involved the exercise of judgment which could reasonably produce different results. All defendants are therefore entitled to absolute immunity.

Defendants' motion for summary judgment is therefore granted on all of the Tenenbaums' state law claims.

### CONCLUSION

As to the causes of action alleged in the complaint, plaintiffs' application for summary judgment is denied, *in toto* and defendants' application is granted in part and denied in part.

Plaintiffs have established that the invasive physical examination of Sarah, following her emergency removal, was violative of the procedural component of the due process clause of the Fourteenth Amendment, and constituted a violation of the Fourth Amendment, as well. However, those defendants who were sued individually with respect to the medical examination are entitled, as a matter of law, to qualified immunity. That defense is not available to the defendant City of New York. Therefore, to the extent the constitutional deprivations are traceable to a policy, procedure, or other actionable wrong of the City, that defendant may be called upon to answer to the Tenenbaums in damages. In addition, the pre-seizure "strip search" claim against the Board of Education remains viable, there being material issues of fact with regard to this claim. Such being the case, it appears to the court that the stay imposed by Judge Amon on the *Monell* claims against the City of New York and the Board of Education should be lifted. However, rather than so ordering, *sua sponte*, counsel for City and the Board is directed to advise the Court and plaintiffs' counsel, on or before October 24, 1994, as to whether it opposes plaintiffs pursuing discovery against the City and Board regarding the remaining claims and, if so, why. If nothing is received from counsel by that date, the stay shall be lifted and discovery may proceed.

---

15. Plaintiffs have apparently abandoned their initial claim that James participated in a "strip search" of Sarah. (Compl. at ¶ 102.) Therefore, the sole remaining targeted defendant—as the issue was framed in the summary judgment motions—is the Board.

Defendants' counsel shall submit a proposed order, on notice, on or before October 24, 1994, indicating, *inter alia,* the causes of action, by number in the Complaint, that have survived the motion for summary judgment (i.e. those pertaining to the medical examination, and the pre-seizure "strip search" of Sarah), and the complaint numbers of the causes of actions that have been dismissed, consistent with this decision.

SO ORDERED.