**J.B., individually, and for her minor child, L.B., Plaintiffs,**

v.

**WASHINGTON COUNTY, Defendant.**

No. 93–C–1038G.

United States District Court,
D. Utah,
Central Division.

Nov. 2, 1995.

Matthew Hilton of Hilton & Steed, Salt Lake City, UT, for Plaintiffs.

Allan L. Larson and Richard A. Van Wagoner of Snow, Christensen & Martineau, Salt Lake City, UT, for Defendant.

## MEMORANDUM DECISION AND ORDER

J. THOMAS GREENE, District Judge.

This matter is before the court on Plaintiffs' Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment. Plaintiffs are represented by Matthew Hilton of Hilton & Steed. Defendant are represented by Allan L. Larson and Richard A. Van Wagoner of Snow, Christensen & Martineau. A hearing on these motions was held on June 8, 1995, after which the matters were taken under advisement. After due consideration of the issues presented, this court renders its Memorandum Decision and Order.

## FACTUAL BACKGROUND

Plaintiffs J.B. and her daughter, L.B., are residents of Washington County, Utah. On April 22, 1993, an anonymous informant notified Washington County Deputy Sheriff Pam Humphreys that the informant had personally witnessed L.B.'s father, R.B., engaged in sexual touching of L.B.[1] The informant further reported that L.B., a seven-year old girl, was home-schooled, that L.B.'s parents did not work outside the home, and that J.B. and L.B. were currently out of town. Deputy Humphreys did not conduct an independent investigation to verify the allegations, nor did she investigate the past criminal history of R.B. (Humphreys Depo. at 25, 37.)

Deputy Humphreys presented the matter to Sheriff Humphries (no relation). It was determined that an interview of L.B. was necessary. Deputy Humphreys' actions in discussing the case with Sheriff Humphries was in accordance with policies and procedures of the Sheriff's Office. (Humphries Depo. at 4–6.) This case was the first one encountered by Deputy Humphreys which involved allegations of abuse by an in-home

---

1. Deputy Humphreys reported her understanding of the circumstances to be that "[w]hen the father realized that the informant had seen what happened, he began tickling the child as if to cover up the [abusive] activity." (Humphrey Depo. at 11.)

perpetrator on a child who was home-schooled. (Humphreys Depo. at 14–16.)

In the typical in-home child abuse case, an interview is conducted with the alleged victim at the child's school. (Humphreys Depo. at 27; Langston Depo. at 8, 13.) In cases of child abuse allegations that involve an alleged in-home perpetrator, investigators avoid notifying the alleged perpetrator prior to an interview with the alleged victim in order to prevent the alleged perpetrator from exercising inappropriate influence over the alleged victim. (Humphreys Depo. at 26; Langston Depo. at 6–8.) This case presented a dilemma because the child had infrequent contacts outside the home.

Because an interview at public school was not available as a method in this case, Deputy Humphreys consulted Janalee Gregory of the Division of Family Services [2] and Deputy County Attorney Brent Langston for advice. Gregory and Humphreys considered interviewing L.B. at church, which was perceived to be "the only time she would be away from her parents." (Humphreys Depo. at 17.) However, they determined not to interview L.B. at church due to concerns for L.B.'s best interest, and fears that contact with church authorities and members would draw undue attention to L.B. and the case. (Humphreys Depo. at 17–18.) Langston and Humphreys considered consulting Juvenile Court Judge Joseph Jackson and determined to do so. (Langston Depo. at 4.)

When presented with the general facts of this case, Judge Jackson recommended that the County Attorney's Office file a petition with the Juvenile Court seeking an order directing temporary removal of L.B. from her home for the purpose of conducting an interview. (Humphreys Depo. at 31–33, and Exhibit 1.) Deputy County Attorney Langston prepared such a petition in which it was alleged that "on information and belief" the child was an "abused child," and requested a hearing. Neither Langston nor Deputy Humphreys previously had been involved in a case in which a court order was sought to remove a child from her home for purposes of an interview. (Humphreys Depo. at 22–24; Langston Depo. at 5.)

At an ex parte hearing on the petition, Judge Jackson questioned Deputy Humphreys concerning the statements of the informant, and entered an Order that L.B. immediately be removed from her home for purposes of an interview and taken to a shelter care location, "there to be held pending a hearing in the ... matter." [3] No date for hearing was set forth in the Order.

Deputy Humphreys delivered Judge Jackson's Order to Deputy Wright for execution. On May 3, 1993, Deputy Wright and Deputy Orvin drove to plaintiffs' home, informed J.B. and R.B. of the contents of the Order, and stated that L.B. was to be temporarily removed from the home. (Wright Depo. at 7.) Deputy Wright served R.B. and J.B. with a copy of the Order and informed them that they would not be able to contact L.B. until an interview had been completed. (Wright Depo. at 16.) Deputies Wright and Orvin then took L.B. to a designated shelter home. L.B. was not visibly upset at that time, and appeared comfortable to the officers. (Orvin Depo. at 14–16.)

The next morning at approximately 8:00 a.m., R.B. and J.B., assisted by their attorney, obtained a copy of the petition. At approximately 9:00 a.m. that same day, L.B. was interviewed by Gregory and Humphreys. The interview lasted about twenty minutes. Neither Gregory nor Humphreys observed any behavior by L.B., or obtained any statement, which would substantiate the child abuse allegations. Therefore, L.B. was immediately returned to her parents' custody following the interview. In total, L.B. was separated from her parents for approximately 17.5 hours.

The County Attorney's Office subsequently filed a Motion to Dismiss the petition in Juvenile Court for lack of evidence. Judge Jackson entered an order granting the motion.

**2.** Personnel from the Division of Family Services are routinely contacted in cases involving alleged "in-home perpetrators." Utah Code Ann. §§ 62A–4–101, *et seq.* (Humphreys Depo. at 14.)

**3.** (Humphreys Depo. at 30–31); *State of Utah, in the interest of L.B.,* No. 847495 (Utah Juv.Ct. May 3, 1993).

## STANDARD OF REVIEW

The standard for summary judgment motions requires that there is no genuine issue of material fact, such that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. In this regard, the Supreme Court has said: "[A] party seeking summary judgment always bears the initial responsibility of informing the court of the basis of the motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). "By its very terms, [the Rule 56] standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no genuine issue of material fact." *Id.* at 247–48, 106 S.Ct. at 2509–10.

In the instant case, both parties have submitted motions for summary judgment. This court has carefully considered the parties' statements of fact, as well as depositions and other documentation, and concludes that the factual background set forth above is agreed

4. Plaintiffs have submitted to the court a document entitled "Plaintiffs' Opposition to Defendant's Factual Statements Supporting Defendants' Motion for Summary Judgment." Contrary to the title of the document, plaintiffs do not therein dispute the material facts set forth in defendant's memorandum. Rather, plaintiffs respond to each factual statement set forth in defendant's memorandum by asserting legal arguments concerning such facts. Plaintiffs' legal arguments are also set forth in the memorandum in support of their motion for partial summary judgment, and were presented at the June 8, 1995, hearing.

5. Plaintiffs have not explained the substance of their allegations concerning failure to train. This court postulates that plaintiffs intended either to proffer such a claim as a theory on which

upon.[4] While there is some dispute over the relative significance of various facts, this court determines that it can appropriately rule as a matter of law, because there is no genuine issue of material fact.

## ANALYSIS

■ Plaintiffs claim that their procedural due process, substantive due process, and equal protection rights under the United States Constitution and the Utah Constitution have been violated. In addition, plaintiffs assert that defendant has failed properly to train its employees in matters concerning constitutional rights.[5]

I. Federal Constitutional Claims Under § 1983.

■ In order to maintain an action under 42 U.S.C. § 1983, plaintiffs must show that (1) Defendant Washington County's employees acted under color of state law, pursuant to a County policy, procedure or custom; and (2) plaintiffs thereby were deprived of a constitutionally cognizable right, privilege or immunity. *Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1202, 103 L.Ed.2d 412 (1989); *Hinton v. City of Elwood, Kansas*, 997 F.2d 774 (10th Cir.1993).

### A. *Existence of "Policy, Procedure or Custom."*

■ The Supreme Court has stated that a municipality or county can be found directly liable under § 1983. *Monell v. Dept. of Soc. Serv.*, 436 U.S. 658, 690, 98 S.Ct. 2018,

to base defendant's liability under § 1983 for its employees' conduct, or as a state law claim separate from their constitutional claims.

As regards the first alternative use of a failure to train theory, the Supreme Court in *Canton v. Harris* considered whether liability can arise under § 1983 "for constitutional violations resulting from ... failure to train" employees, and held that such liability is permitted only where the lack of proper training shows "deliberate indifference" to the rights of persons with whom the employees come into contact. 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Plaintiffs have not argued that such deliberate indifference exists in this case. However, the complaint appears to assert failure to train as a separate state law claim, this court will treat it as such. *See infra*, p. 993.

2035, 56 L.Ed.2d 611 (1978). The Tenth Circuit set forth the requirements to maintain an action against a municipality or county in *Cannon v. City and County of Denver,* 998 F.2d 867, 877 (10th Cir.1993),[6] stating

> The touchstone of a § 1983 action against a governmental body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution ... Municipalities can be held liable only when an injury was inflicted by execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may be fairly said to represent official policy.

It is not necessary that the government's policy or custom be formally adopted or written. Rather, as stated by the Supreme Court:

> [I]t is plain that [county] liability may be imposed for a single decision by [county] policymakers under appropriate circumstances ... If the decision to adopt [a] particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the [county] is equally responsible whether that action is to be taken once or to be taken repeatedly.

*Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–81, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986).

■ Deputy County Attorney Brent Langston is an "authorized decisionmaker" for Defendant Washington County in matters involving child abuse. He is the attorney responsible for child abuse matters in the County Attorney's Office, which office is specifically authorized by statute to represent the state in any proceedings involving the rights and interests of a juvenile. *See* Langston Depo. at 5; Utah Code Ann. § 17–18–

1(7). *Cf. City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) ('[W]hether a particular official has "final policymaking authority' is a question of *state law.*" (emphasis in original)).

■ Deputy Sheriff Humphreys cannot accurately be characterized as an "authorized decisionmaker" for Washington County. However, her actions in this matter were specifically ratified and approved by Sheriff Humphries.[7] As stated by the Supreme Court in *Praprotnik,*

> When a subordinate's decision is subject to review by the [county's] authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the [county] because their decision is final.

485 U.S. at 127, 108 S.Ct. at 926 (emphasis in original). Accordingly, Sheriff Humphries approval of Deputy Humphreys actions is chargeable to Defendant Washington County as its policy or custom.

This court finds and holds that the actions taken by Deputy Sheriff Humphreys and Deputy County Attorney Langston constituted a "policy, procedure or custom" of Defendant Washington County. The court next proceeds to analyze whether implementation of defendant's "policy, procedure or custom" in this case resulted in deprivation of plaintiffs' constitutional rights.

### B. *Deprivation of Constitutional Rights.*

#### 1. Procedural Due Process.

Plaintiffs claim that the actions of defendant in obtaining and executing the *ex parte* order requiring L.B.'s removal violated their right to procedural due process. In this regard, plaintiffs argue that defendant's em-

---

6. *See also Hinton,* 997 F.2d 774 ("[T]o establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy and custom and the injury alleged. *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989).").

7. At his deposition, Sheriff Humphries was asked: "You in fact approved [in the reports] what Deputy Pam Humphreys did as being in accordance with your policies and procedures and practices as County Sheriff?" Sheriff Humphries responded: "I did." Humphries Depo. at 4.

ployees failed adequately to investigate the allegations of child abuse by not performing an on-site investigation at L.B.'s house, and did not comply with relevant provisions of the Utah Rules of Civil Procedure and the Juvenile Court Rules of Practice.[8]

■ Plaintiffs cannot rely on defendant's failure to follow state statutes or rules to create a federal constitutional claim. *Flanagan v. Munger*, 890 F.2d 1557, 1571 (10th Cir.1989). While such state law violations may give rise to causes of action on the state level, no such cause of action is before this court.[9] This court must review the actions of defendant according to standards of procedural due process under the federal constitution as interpreted and applied by federal courts.

■ The Supreme Court has stated that "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). In determining whether defendant's actions and procedures in this case satisfy the flexible demands of procedural due process, this court must weigh the competing private and governmental interests, the extent to which those interests were served by the actions taken in this case, and the feasibility of alternative less-intrusive procedures. *See Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

■ A parent's interest in the custody and care of her or his children is a fundamental right. *See Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972); *Jordan by Jordan v. Jackson*, 15 F.3d 333, 342 (4th Cir.1994). The bonds of a unitary family are the foundation of society.[10]

■ On the other hand, the government's corresponding interest is not insubstantial. The government, as *parens patriae*, holds a compelling interest in the safety and welfare of the children within its jurisdiction. *See, e.g. Lassiter v. Dep't of Soc. Serv.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 2159, 68 L.Ed.2d 640 (1981); *Jordan*, 15 F.3d at 346. In keeping with the flexible requirements of procedural due process, considerable deference should be given to the judgment of responsible government officials in acting to protect children from perceived imminent danger or abuse. *Jordan*, 15 F.3d at 348.

■ In balancing these competing interests in the instant case, this court holds that defendant's actions and procedures did not violate plaintiffs' procedural due process rights under the federal constitution. Defendants correctly maintain that the reliability of a child's statements at an interview is of paramount importance. Unreliable or contaminated evidence resulting from the exercise of undue influence by the alleged abuse perpetrator will destroy the utility of the interview and prevent the defendant's employees from ascertaining whether a child is in need of further care and protection. Consequently, in this case, it was infeasible and not advisable for defendant's employees to alert J.B. or R.B. of the nature of the allegations against R.B. prior to conducting the interview of L.B. State officials could not

---

8. Plaintiffs claim that "the effect of [defendant's] failure to follow [the procedural rules] has been to deny fundamental fairness and due process to Plaintiffs when the mechanism of judicial involvement is invoked." Pls. Memo. at 35.

9. Because specific and distinct rules have been promulgated concerning Juvenile Court proceedings, it appears that the more general Rules of Civil Procedure would be inapplicable in those courts. Rule 1 of the Utah Rules of Civil Procedure states that those rules shall apply in all Utah courts "except as governed by other rules promulgated by [the Utah Supreme Court] or enacted by the Legislature...."

10. As noted by the court in *Jordan*, "[t]here is some question over the precise legal character of a child's liberty interest implicated by the assumption of his custody by the state since, as a minor, he will always be in someone's custody." 15 F.3d at 343, n. 10 (internal citations omitted). However, the Supreme Court has held that children have a limited liberty interest independent of their parents, and that procedural due process must accompany a child's confinement. *See Schall v. Martin*, 467 U.S. 253, 263, 104 S.Ct. 2403, 2409, 81 L.Ed.2d 207 (1984) (preventive pretrial detention); *Parham v. J.R.*, 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979) (commitment to a mental institution).

guess what circumstances existed in the home, or whether J.B. would assist in or deter defendant's efforts properly to investigate the matter.

As plaintiffs assert, the petition to Juvenile Court Judge Joseph Jackson was brief and did not set forth the specific details of the abuse allegations. However, such pleading appears to be in compliance with Utah Code Ann. § 78–3a–23, which requires that "[t]he petition set forth in *simple and brief language* the facts which bring the child within the jurisdiction of the court...." (emphasis added). In addition, prior to entering the order for temporary custody, Judge Jackson held an ex parte hearing at which Deputy Humphreys testified.

While this court is cognizant of the natural trauma and concern that plaintiffs experienced during the events surrounding and following L.B.'s removal from her home, the potential consequences of erroneously leaving or returning a child to an abusive situation are enormous. In view of defendant's compelling interest in protecting L.B. which arose from the report of an eye-witness informant,[11] the apparently careful and considered method by which defendant's employees proceeded in the matter, and the involvement of the Juvenile Court which is statutorily imbued with the authority to deal with child

abuse allegations,[12] this court finds and holds that plaintiffs procedural due process rights under the federal constitution were not violated in this case.[13]

### 2. Substantive Due Process.

#### a. Familial Association Rights.

■ Plaintiffs claim that defendant's actions also contravened plaintiffs' substantive due process rights of familial association. The substantive right of intimate or familial association is "consonant with the right of privacy." *Griffin v. Strong*, 983 F.2d 1544, 1547 (10th Cir.1993). *See also Fleisher v. Signal Hill*, 829 F.2d 1491, 1499 (9th Cir. 1987), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988); *Arnold v. Board of Educ.*, 880 F.2d 305, 312 (11th Cir.1989).

■ The Tenth Circuit has declared that "[i]n classic fourteenth amendment liberty analysis, a determination that a party's constitutional rights have been violated requires 'a balancing [of] liberty interests against the relevant state interests.'" *Griffin*, 983 F.2d at 1547 (citing *Youngberg v. Romeo*, 457 U.S. 307, 321, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982)). This balancing of interests applies to cases involving familial association rights. *Id.* In this case, the court must balance the defendant's interest in investigating reports

**11.** Typically, child abuse allegations arise from observation of the child, i.e., bruises, scrapes, or evident emotional insecurities. In this case, the child abuse allegations arose from the report of an eye-witness informant.

**12.** Plaintiffs argue that Judge Jackson's consultation with Deputy Sheriff Humphreys and Deputy County Attorney Langston was improper, that the removal order was entered erroneously, and that the process of review of such an Order provided for by Rule 13 of the Juvenile Court Rules of Practice is inadequate. This court disagrees. *See* discussion in text, *infra*, p. 16. In all events, these are state law issues not properly asserted as federal due process violations.

**13.** On hindsight, different procedures may have been taken that would·have been less intrusive, such as conducting the interview in the shelter care center sooner and without requiring overnight detention. Also, county officials could have taken opportunity after L.B. was removed pursuant to court order to explain to J.B. and R.B. the nature of the allegations, and the intended course of investigation. Indeed, the Supreme

Court has stated that "[a] wise public policy ... may require that higher standards be adopted than those minimally tolerable under the Constitution." *Lassiter*, 452 U.S. at 33, 101 S.Ct. at 2162. However, this court determines that the procedures taken by defendant's employees in this case, while perhaps not ideal as public policy, constitute a permissible balancing of the substantial private and public issues at stake as regards federal procedural due process.

Plaintiffs argue that county officials should have provided J.B. and R.B. with a post-deprivation hearing to ratify the initial emergency removal of L.B. *See Weller v. Dep't of Soc. Serv.*, 901 F.2d 387, 396 (4th Cir.1990); *Doe v. Hennepin County*, 858 F.2d 1325, 1329 (8th Cir.1988), *cert. denied*, 490 U.S. 1108, 109 S.Ct. 3161, 104 L.Ed.2d 1023 (1989). Utah law provides for a mandatory post-deprivation hearing following an emergency removal of a child which lasts 48 hours or more to determine the validity of continuing state custody of the child. Utah Code Ann. § 78–3a–30(4)(a). The need for such a hearing was obviated in this case because detention of L.B. ended within only 18 hours.

of child abuse and protecting children against the plaintiffs' interests in their familial rights of association. These interests are weighed "to determine whether [defendant's] conduct in this case constituted an undue burden on [plaintiffs'] associational rights." *Id.* *See also Hodgson v. Minnesota,* 497 U.S. 417, 446, 110 S.Ct. 2926, 2942, 111 L.Ed.2d 344 (1990).

■ The government's interest in investigating allegations of child abuse is of very great importance. *Griffin,* 983 F.2d at 1548; *State v. Jordan,* 665 P.2d 1280, 1285 (Utah 1983), *appeal dismissed,* 464 U.S. 910, 104 S.Ct. 266, 78 L.Ed.2d 249 (1983). In this regard, the Supreme Court has declared that governmental entities have a "traditional and 'transcendent interest'" in protecting the children in its jurisdiction from abuse. *Maryland v. Craig,* 497 U.S. 836, 855, 110 S.Ct. 3157, 3168, 111 L.Ed.2d 666 (1990) (internal citations omitted). *See also Griffin,* 983 F.2d at 1548. Investigation of child abuse allegations "deserves no less attention." *Id.*

Plaintiffs' interest weighs very heavily also because it has to do with the right to associate with one's family. *Id.* Again, the Supreme Court has recognized the importance of that interest:

> [Family relationships] by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctly personal aspects of one's life.

*Roberts v. United States Jaycees,* 468 U.S. 609, 619–20, 104 S.Ct. 3244, 3250–51, 82 L.Ed.2d 462 (1984) (quoted in *Arnold,* 880 F.2d at 312–13).

■ In considering the balance of these interests, the Tenth Circuit has provided this guidance: "Not every statement or act that *results* in an interference with the rights of intimate association is actionable," and in order to constitute an undue burden, "defendant must *direct* his or her statements or conduct at the intimate relationship with knowledge that the statements or conduct will adversely affect that relationship." *Griffin,* 983 F.2d at 1548 (emphasis in original).

*See also Trujillo v. Board of County Commissioners,* 768 F.2d 1186, 1190 (10th Cir. 1985). Further, "[t]he right of intimate association is not absolute." *Griffin,* 983 F.2d at 1549.

Turning to the facts of this case, it is evident that there was interference with plaintiffs' rights of familial association. L.B. was physically removed from her home and from her parents for a period of almost 18 hours. This period included an overnight stay at a pre-arranged shelter home. Plaintiffs argue that the length of L.B.'s absence was excessive, and that the defendant's objectives of conducting an interview could have been accomplished within a shorter period. Defendant argues that the objective was not only to conduct an interview, but was also to ensure that L.B.'s statements at the interview were made free from any pressure or influence that might have been exercised on L.B. by R.B., the alleged perpetrator. In light of this important concern, defendant asserts that the overnight custody of L.B. outside the presence of her parents was not excessive or unreasonable, and therefore the interference with plaintiffs' familial association rights in this case was not unduly burdensome.

■ While this court believes that the defendant's objectives might have been accomplished within a shorter period, there is no evidence that defendant's employees intended or directed their conduct in this matter at the familial relationship of L.B. and J.B. with knowledge that such conduct would adversely affect that relationship as required by the Tenth Circuit. *Griffin,* 983 F.2d at 1546, 1548. Absent such evidence of wilfulness or intent, this court finds that no genuine issue of material fact exists as to this matter, and holds that no undue burden that rises to the level of a constitutional claim is present in this case. Accordingly, summary judgment should be entered in favor of defendant on this issue.

### b. Fourth Amendment Rights.

In their moving papers, plaintiffs assert a claim of unreasonable search and seizure under the Fourth Amendment. Although this claim is not expressly set forth in the com-

plaint, plaintiffs argue that it is implied in their substantive due process claim. *See Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961). For purposes of this opinion, this court will treat it as such.

*Only The Child, L.B., Has Standing*

■ As an initial matter, this court rules that since only the child, L.B., has been the object of a seizure, she is the only plaintiff who may maintain an action for violation of her Fourth Amendment rights. Plaintiff J.B., her parent, cannot bring an action under a theory of derivative harm. *See Donald v. Polk County,* 836 F.2d 376 (7th Cir.1988).

*Neutral, Detached Magistrate*

■ Plaintiff argues that the warrant in this case was not issued by a neutral, detached magistrate.[14] In this regard, plaintiff L.B. argues that Juvenile Court Judge Joseph Jackson was not neutral and detached because he conducted an *ex parte* hearing on this matter prior to the submission of a formal petition. The Supreme Court has stated that "one is entitled as a matter of due process of law to an adjudicator who is not in a situation 'which would offer a possible temptation to the average man as a judge ... which might lead him not to hold the balance nice, clear and true....'" *Concrete Pipe and Products of California, Inc. v. Constr. Laborers Pension Trust for So. California,* 508 U.S. 602, ——, 113 S.Ct. 2264, 2277, 124 L.Ed.2d 539 (1993) (internal citations omitted). The Fourth Amendment is violated when a judge abandons the judicial role and functions as "an adjunct law enforcement officer." *United States v. Leon,* 468 U.S. 897, 914, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677 (1984). The court must focus on the circumstances surrounding the issuance of the warrant for search or seizure, and determine whether the judge "manifest[ed] that neutrality and detachment demanded of a judicial officer when presented with a warrant application...." *Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319, 327, 99 S.Ct. 2319, 2325, 60 L.Ed.2d 920 (1979).

■ In the instant case, plaintiff L.B. does not allege that Judge Jackson was interested in R.B.'s prosecution, or was engaged in investigation of L.B.'s case. The only proffered allegation on this subject is that Judge Jackson participated in a procedurally unusual *ex parte* "hearing" prior to the filing of a formal petition, at which time he simply made the suggestion that a petition be filed. After the petition was filed and the matter was officially before the court, Judge Jackson examined Deputy Humphreys regarding the substance of the child abuse allegations. Under the circumstances, this court does not regard Judge Jackson as being anything but a neutral and detached judge, or that Judge Jackson abandoned the impartial judicial role.

*Probable Cause Based On An Anonymous Tip In Child Abuse Cases*

Turning to the requirement of probable cause, the Supreme Court has not had occasion to decide whether probable cause, or some lesser standard, applies to the removal of children in cases where child abuse is alleged. Plaintiff argues in favor of the application of the usual standard of a warrant based on probable cause. The Supreme Court does require that the judge "make a practical, common sense decision whether, given all the circumstances ... before him [or her] ... there is a fair probability that the facts to which the probable cause determination is addressed exist." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). The application of this standard should not hinder or frustrate child abuse investigations. *See Tenenbaum v. Williams,* 862 F.Supp. 962, 975 (E.D.N.Y.1994).

■ The Supreme Court has set forth a general rule that uncorroborated, anonymous tips do not provide probable cause for the issuance of a warrant. *Gates,* 462 U.S. at 227, 103 S.Ct. at 2326. Such reports by anonymous informants may be motivated by malice, and absent sufficient corroboration,

---

**14.** Pls.Reply Mem. at 9. *See also Dalia v. United States,* 441 U.S. 238, 255, 99 S.Ct. 1682, 1692, 60 L.Ed.2d 177 (1978).

do not comport with the requirements of the Fourth Amendment. *See Tenenbaum,* 862 F.Supp. at 976. In this case, the information on which the warrant was based appears to be primarily composed of the allegations submitted by an anonymous informant. Deputy Humphreys testified that she knew the actual identity of the informant, but did not disclose it due to Utah law providing anonymity for child abuse informants. (Humphreys Depo. at 8.) Deputy Humphreys also admitted that she did not investigate the background or objective credibility of the informant. (*Id.* at 8–9.) Therefore, the substance of her report, which was subject to review by Judge Jackson, merely set forth the allegations and statements of the informant in response to queries by Deputy Humphreys.

In many circumstances, such information would not provide sufficient probable cause for purposes of the Fourth Amendment. *See Alabama v. White,* 496 U.S. 325, 329, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990). However, this court "[must] not evaluate constitutional rules in a vacuum," but must instead look to the realities of the investigation process. *Griffin,* 983 F.2d at 1547. In the instant case, Deputy Humphreys spoke with the informant at some length on the telephone. The informant reported her observations of what was perceived to be sexual abuse. The informant also stated that L.B. was an only child and home-schooled, that R.B. was not employed outside the home, and that J.B. and L.B. were out of town. Plaintiff argues that an investigation into the specific allegations of the informant would have revealed that J.B. and L.B. were not out of town at the time, and that this inaccuracy in the informant's report would have cast doubt on the informant's veracity.

■ Defendant's employees were under a duty to make reasonable investigation into the accuracy and reliability of the informant's report. However, even if Deputy Humphreys had closely investigated the informant's report, the only allegation which could have been checked without alerting the alleged perpetrator was that J.B. and L.B. were out of town. That allegation was immaterial to the informant's substantive allegations of sexual abuse. Moreover, even if Deputy Humphreys had been aware of the inaccuracy of that particular allegation, it would not have obviated the need to have a personal interview with L.B. Accordingly, this court determines that the significant allegations of the anonymous eye-witness informant could not have been verified in any manner other than by a personal interview of L.B. away from the alleged in-home perpetrator.[15] To hold otherwise would substantially frustrate the defendant's compelling interest in protecting L.B. from child abuse.

### 3. Equal Protection.

Plaintiffs claim that defendant's actions toward plaintiffs constituted a violation of plaintiffs' rights to equal protection because such actions differed from the normal procedure applied in juvenile cases. Defendant's usual policy in cases involving an alleged in-home perpetrator is to interview the child at her or his school, while the child are away from the presence and direct influence of parents. In this case, because L.B. was home-schooled, defendant was unable to interview her at school.

■ The Supreme Court has held that the government cannot, without a compelling reason, classify similarly situated persons in such a way as to directly and significantly interfere with one class' fundamental rights. *See, e.g. Foucha v. Louisiana,* 504 U.S. 71, 84, 112 S.Ct. 1780, 1788, 118 L.Ed.2d 437 (1992) (indefinite detention); *Zablocki v. Redhail,* 434 U.S. 374, 383, 98 S.Ct. 673, 679, 54 L.Ed.2d 618 (1978) (direct impediment to marriage); *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942) (forced sterilization). In this regard, the Tenth Circuit has stated that:

> The equal protection analysis requires strict scrutiny of a [governmental] classification only when the classification impermissibly interferes with the exercise of a

---

15. This ruling is directed only at the facts of this case. In other cases, the duty of government officials to investigate the veracity of an anonymous informant might be more feasible, and a higher degree of probable cause would be required.

fundamental right or operates to the peculiar disadvantage of a suspect class.

*U.S. v. Lee,* 957 F.2d 778, 782 (10th Cir.1992), *cert. denied,* 506 U.S. 978, ——, 113 S.Ct. 475, 121 L.Ed.2d 381 (1992).

 Plaintiff does not argue, nor have courts held, that children and their parents that elect home-schooling constitute a suspect class under equal protection analysis. Rather, plaintiff asserts that the defendant's policy in this case interfered with the fundamental right of a parent to direct the upbringing and education of their child, and of familial association. Such a right has been recognized by the Supreme Court. *See, e.g., Wisconsin v. Yoder,* 406 U.S. 205, 213, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972). However, not every interference with a fundamental right will trigger strict scrutiny. *See Zablocki,* 434 U.S. at 386–87, 98 S.Ct. at 681–82 ("[R]easonable regulations that do not significantly interfere with decisions to enter into the marital relationship may be legitimately imposed.").

 Defendant's policy in this case did not directly interfere with plaintiffs' rights concerning L.B.'s education. No affirmative impediment to the exercise of that right was imposed. Instead, defendant's employees merely chose a different method of dealing with the child abuse allegation as a result of plaintiffs' different circumstances. Such alleged infringement on plaintiffs' rights is vastly different than the substantial and direct impairment that was considered in the Supreme Court's decisions cited above. *See Foucha,* 504 U.S. at 84, 112 S.Ct. at 1788 (indefinite confinement); *Zablocki,* 434 U.S. at 387–88, 98 S.Ct. at 682 (insurmountable impediment to marriage); *Skinner,* 316 U.S. at 541, 62 S.Ct. at 1113 (irreversible sterilization as punishment).

 A classification subject to rationality review "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts which could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.,* 508 U.S. 307, ——, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993). In this connection, a classification based on a plaintiff's educational choice need only rationally further a legitimate state interest in order to satisfy the requirements of the Equal Protection Clause. *See Jordan,* 15 F.3d at 356. *See also Nordlinger v. Hahn,* 505 U.S. 1, 8–10, 112 S.Ct. 2326, 2331–32, 120 L.Ed.2d 1 (1992).

 In this case, defendant's employees concluded that a personal interview of L.B. outside the presence of her parents was the best method of ascertaining whether she was being sexually abused. The alternative methods proposed by plaintiffs—i.e., to interview L.B. at church while her parents were not present, or to interview L.B. at home in a private room—were considered by defendant's employees and determined to be too problematic. It was entirely rational for defendant's employees to conclude that the most appropriate method of obtaining an interview with L.B. was by means of a court order authorizing removal of L.B. for that purpose. Therefore, the classifications in this case, and the conduct of defendant's employees based thereon, do not violate the Equal Protection Clause.

## II. State Constitutional Claims.

Plaintiffs also assert that their rights to procedural and substantive due process, as well as their rights to equal protection under the Utah Constitution, were violated.[16]

The due process provisions of the Utah Constitution and the United States Constitu-

---

**16.** While this court proceeds to analyze plaintiffs' state constitutional claims on the merits, there are two other grounds on which plaintiffs' state constitutional claims might be resolved. First, there appears to be no direct statutory or common law private cause of action for violation of provisions of the Utah State Constitution which are not self-executing. *See Condemarin v. University Hospital,* 775 P.2d 348 (Utah 1989) (Hall, J., dissenting) (noting that no private cause of action under the Utah Constitution appears to exist since no remedy is provided); *Brown v. Wightman,* 47 Utah 31, 151 P. 366 (1915). In this regard, there appears to be no statutory authorization in Utah for the bringing of private actions for violation of civil rights under the Utah Constitution analogous to the federal Civil Rights Act, 42 U.S.C. § 1981, *et seq.,* under which private actions for violation of the United States Constitution may be asserted. In *Colman v. Utah State Land Board,* 795 P.2d 622 (Utah 1990), the Utah Supreme Court recognized an exception in Article I § 22 which relates to just compensation for the taking of private property. That section of the Utah Constitution provides:

tion are similarly worded. In this regard, the Fifth and Fourteenth Amendments to the United States Constitution guarantee that the government shall not "deprive any person of life, liberty, or property, without due process of law . . .;" and Article I, Section 7 of the Utah Constitution states that "No person shall be deprived of life, liberty, or property, without due process of law." In the several cases in which the Utah Supreme Court has discussed the interpretation of the Utah due process provisions, federal case law has been relied upon. *See Terra Utilities, Inc. v. Public Serv. Comm'n,* 575 P.2d 1029, 1033 (Utah 1978) (holding that decisions of the United States Supreme Court regarding the due process guarantees of the United States Constitution "are highly persuasive as to the application of that [due process] clause of our state Constitution"). *See also Baird v. Cutler,* 883 F.Supp. 591, 605–06 (D.Ut.1995); *Jane L. v. Bangerter,* 794 F.Supp. 1528, 1531–32 (D.Ut.1992).

The equal protection clauses of the two constitutions are worded differently. The Fourteenth Amendment to the United States Constitution provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws;" and Article I, Section 24 of the Utah Constitution states

that "All laws of a general nature shall have uniform operation." Despite the language differences, the Utah Supreme Court has stated that the clauses "embody the same general principle: persons similarly situated should be treated similarly, and persons in different circumstances should not be treated as if their circumstances were the same." *Malan v. Lewis,* 693 P.2d 661, 669 (Utah 1984) (footnote omitted). Indeed, in interpreting the equal protection clause of the Utah Constitution, Utah courts routinely have cited and relied on federal case law in applying an analysis identical to the one designed by the United States Supreme Court for use in cases implicating the federal equal protection clause. *See Greenwood v. City of North Salt Lake,* 817 P.2d 816, 820–21 (Utah 1991); *Day v. Utah Dept. of Public Safety,* 882 P.2d 1150, 1159 (Ut.Ct.App.1994), *cert. granted,* 892 P.2d 13 (Utah 1995).[17]

Accordingly, plaintiffs' due process and equal protection claims under the Utah Constitution are dismissed for the same reasons as set forth above concerning the United States Constitution.

## III. Failure to Train.

Assuming that plaintiffs intended to assert a state law claim based on allegations of

---

"Private property shall not be taken or damaged for public use without just compensation." In *Colman,* the Court held that the just compensation section of the Utah Constitution was self-executing, mandatory, and obligatory. *Id.* at 635. The Court stated that whether a particular constitutional provision is self-executing "involves the issue of whether the constitutional provision requires a legislative enactment to be enforced by the courts." *Id.* at 630. Of course, whether a private cause of action could be brought for violation of Utah State Constitutional provisions is a matter for ultimate determination by the Utah Supreme Court. *Id.* at 386 n. 9. Until and unless the Supreme Court of Utah rules otherwise, this court rules that plaintiffs' direct claims under the Utah Constitution may not be asserted under Utah law.

Second, it appears that defendant is immune from suit at least as regards claims for damages under the Utah Governmental Immunity Act ("the Act"), which provides:

Except as may be otherwise provided in this chapter, all governmental entities are immune from suit for any injury which results from the exercise of a governmental function . . .
Utah Code Ann. § 63–30–3(1).

The Act does not provide for waiver of immunity for claims based on the due process or equal protection clauses of the Utah Constitution as against political subdivisions of the state. A "political subdivision" is defined as any county, city, town, school district, public transit district, redevelopment agency, special improvement or taxing district, or other governmental subdivision or public corporation. Utah Code Ann. § 63–30–2(7). It follows that Defendant Washington County is immune from plaintiffs' damages claims under the Utah Constitution. The Utah Supreme Court has not passed upon the constitutionality of the Governmental Immunity Act as applied to actions for declaratory or injunctive relief, or damages, based upon the Utah Constitution, and this court declines to do so.

17. The Utah Supreme Court has noted that:
The different language of Article I, § 24, the different constitutional contexts of the two provisions, and different jurisprudential considerations may lead to a different result in applying equal protection principles under Article I, § 24 than might be reached under federal law. *Malan,* 693 P.2d at 670. However, the Court has not indicated any different analysis, nor has the plaintiff in this case proposed any.

failure to train, this court will decline to exercise jurisdiction over such claim. A review of plaintiffs' papers reveals that such a state law failure to train claim has not been comprehensively argued or addressed.[18]

■ 28 U.S.C. § 1367 grants district courts discretion to decline to exercise supplemental jurisdiction when the state law claims predominate over any remaining federal claim. Because the court has determined to grant defendant's summary judgment motion as to plaintiffs' claims under the federal constitution, any remaining state law claim in this case clearly "predominate[s] over the claim ... over which [this court] has original jurisdiction." 28 U.S.C. § 1367(c)(2). Accordingly, this court dismisses without prejudice to further proceedings in state court any state law claim based on failure to train as well as any remaining state law claim.

Based on the foregoing, it is hereby

ORDERED, that Defendants' Motion to for Summary Judgment is GRANTED, and plaintiffs' federal claims are dismissed with prejudice; it is further

ORDERED, that plaintiffs' claims based upon a theory of failure to train and any remaining state law claims are dismissed without prejudice to further proceedings in state court; it is further

ORDERED, that Plaintiffs' Motion for Partial Summary Judgment is DENIED.

18. As noted, *supra*, n. 4, plaintiffs may have intended to assert their failure to train claim as a basis for liability under § 1983 because of alleged constitutional violations by defendant's employees. This court has ruled that such a claim is not viable under § 1983 in this case, but expresses no opinion concerning the merits of such a claim under state law.